UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LARRY EWERS,　　　　　　　　　　　　　　　　）
　　　Plaintiff,　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　　　　　　　）　CIVIL ACTION
　　　　　　　　　　　　　　　　　　　　　　　）　NO. 04-10024-RWZ
CHRISTOPHER PATRICK HERON,　　　　　　　　　）
CORPORATION OF THE BANKHOUSE, INC.,　　　　　）
SOCIETE BANKHOUSE, and　　　　　　　　　　　　）
JAMES F. POMEROY, II,　　　　　　　　　　　　　）
　　　Defendants.　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　　）

## PLAINTIFF'S OPPOSITION TO MOTION TO INTERVENE

Plaintiff Larry Ewers opposes the Motion to Intervene filed by certain intervenors.[1] The Motion should be denied for reasons of law and equity, including:

- The intervenors' claim that Ewers' Power of Attorney from Liner has been revoked is insupportable: the Power of Attorney is irrevocable under black letter, controlling Texas law. Indeed, intervenor Alex Pladott, only weeks before the attempted intervention, rejected his current position, and urged Ewers to file a motion for injunctive relief against Pladott's current co-intervenor, Eugene Liner, on the grounds that "Liner cannot directly or indirectly alter, modify or revoke your Power-of-Attorney." *See* Exhibit 1.

- The intervenors' unsupported accusations that Ewers has attempted to defraud them are belied by the documented history of full disclosure to the Trustee in Christopher Patrick Heron's Bankruptcy in the United Kingdom; the Trustee's counsel; through them, all of the creditors; and Pladott directly, since well before its initiation. They consented to it, waived any objection to it, and are estopped at this late stage, on the eve of final judgment, to challenge it.

- Finally, Pladott, Liner and the Trustee have all refused to share the costs of this litigation. (*See* Exhibit 2, Pladott's e-mail of October 14, 2003: "Concerning Boston, while we were there I explained the reasons why I

---

[1] Howard Eugene Liner, Creditors Committee of the Bankruptcy Estate of Christopher Patrick Heron, Ah Ping Ban, Flamecrest Enterprises Limited Trust, and Blatz [*sic*] Rudolph Wolfensberger Trust. As discussed below, Liner has no standing; the so-called Creditors Committee is neither duly constituted nor possessed of standing under United Kingdom law to act on its own; Flamecrest has been dissolved and liquidated; we know nothing of the existence of the Balz Trust; and Pladott has known of and consented to this litigation since its inception.

cannot participate in your financial effort in there. Please be assured that I, like you, look forward to winning the war.") By their present motion, intervenors seek all of the advantages of participation, while having shared in none of the costs. This tactic is patently inequitable.

## FACTUAL BACKGROUND

The background facts of this case were set forth in detail in Ewers' Complaint instituting this action and in the Affidavits of Alan M. Spiro in support of Plaintiff's Motion for Entry of Default Judgment dated June 15, 2004 and in support of Plaintiff's Motion for Entry of Default Judgment against Defendant Christopher Patrick Heron dated July 9, 2004.[2] The facts pertinent to the present Motion to Intervene are as follows.

Ewers filed this case on January 7, 2004, expressly pursuant to an Exclusive Power of Attorney and Mandate ("POA") executed on June 15, 2002. See Exhibit 3. By means of the POA, intervenor Howard Eugene Liner ("Liner") unmistakably appointed Ewers "his sole, exclusive, true, and lawful Attorney-In-Fact and Mandate ... to act in [Liner's] place, and stead for the purpose of doing any and every act, and exercise any and every power, that [Liner] could do...." The POA specifically provides that it "is irrevocable, and coupled with an interest." The POA grants Ewers the power to do "all acts necessary in the prosecution of the claims ... to the exclusion of all other persons or entities, including myself [Liner], my heirs and assigns."

As detailed below, both before and after the filing of this case, Ewers communicated openly with the intervenors, including:

- Malcolm Harris, the Trustee in Heron's Bankruptcy pending in the United Kingdom, who consented to this litigation on his own behalf and, impliedly, for the creditors he represented and with whom he communicated;

---

[2] Attached as Exhibit A to the Affidavit dated June 15, 2004 is the January 17, 2002 Agreement among Liner (by Ewers under his Power of Attorney), Ban, Pladott, Heron and another – the very Agreement fully disclosing the positions of all of the intervenors which, they seem to suggest, had been somehow hidden from the Court.

- The Trustee's counsel, Nicholas Pike ("Pike") (of Lawrence Graham, a substantial law firm in the United Kingdom), who was informed before the fact of, and was kept aware of developments in, the Boston Litigation; and

- Alex Pladott, self-proclaimed representative of intervenors, who, although at all times fully informed of the Boston Litigation, nonetheless refused to participate in the burdens or to share the expenses.

Equally important, no proffer has been made of any evidence suggesting that Ewers will not honor his agreements with the intervenors concerning the division of any funds recovered, in accordance with the terms of those agreements. If Ewers were, hypothetically, to fail to do so, the intervenors would then have a remedy at law: indeed, as discussed below, there are two cases pending in the State of Texas, against Liner and Pladott, for breach of those very agreements.

The belated entry of intervenors can be seen for what it obviously is – an opportunistic attempt to insert themselves into this case, of which they had full knowledge since before its inception, on the eve of final judgments, and thereby to obtain all of the benefits of the litigation without having shouldered any of its burdens or costs.[3] Intervenors' attempts are hypocritical, too little and too late under Fed. R. Civ. P. 24(a) and (b). They fail to adequately establish that their interests might be impaired if they are not permitted to intervene, fail to prove that Ewers does not adequately represent their interests, and fall short of demonstrating that their intervention will not unduly delay or prejudice the adjudication of Ewers' rights. Moreover, intervenors' proposed Complaint fails as a matter of law, as it contains allegations which are completely unsubstantiated factually and indefensible as a matter of law, to such an extent, we submit, that the allegations expose the intervenors to sanctions under Rule 11, Fed.R.Civ.P.

---

[3] In a gambit reminiscent of the story of "The Little Red Hen," only after Pladott and the other intervenors have said "Not I!" to the Little Red Hen's pleas for help with the planting, cutting, threshing, milling and baking of the bread, do they belatedly rise up as one to say "I will!" to helping with the eating of the bread.

## ARGUMENT

### I. Ewers' Power of Attorney Is Irrevocable as a Matter of Law.

Because of its centrality to intervenors' claim, we first address the fundamental fallacy of their position: the claim in ¶ 36 of their proposed Complaint that the POA "was terminated effective July 16, 2004." This conclusion of law, the lynchpin of intervenors' proposed Complaint, is insupportable in fact or law.

Liner, by means of the POA, appointed Ewers:

> "his sole, exclusive, true, and lawful Attorney-In-Fact and Mandate ... to act in [Liner's] place, and stead for the purpose of doing any and every act, and exercise any and every power, that [Liner] could do, and that may be reasonably necessary regarding the following contracts and matters: ... Cause No. 1625 of 2002: In The High Court Of Justice In Bankruptcy: RE: Christopher Patrick Heron."

*See* Exhibit 3. The POA specifically provides:

> "This Exclusive Power Of Attorney And Mandate shall not terminate on my disability, *is irrevocable*, and *coupled with an interest*, and shall only terminate upon the full and final adjudication, resolution, settlement, and disposal of the referenced matters and contracts. *I agree that anyone dealing with said Attorney-In-Fact and Mandate may rely upon the statement(s) of such Attorney-In-Fact and Mandate, that this Exclusive Power of Attorney and Mandate has not been revoked* or modified in any manner...."

> "I hereby ratify and confirm that my sole and exclusive Attorney-In-Fact and Mandate shall lawfully do, or cause to be done by virtue of this Exclusive Power of Attorney and Mandate along with the rights and powers granted herein, *all acts necessary in the prosecution of the claims asserted in the referenced matter and the rights granted under said contracts. Said Attorney-In-Fact and Mandate shall have the powers set forth herein to the exclusion of all other persons or entities, including myself, my heirs and assigns.*" (Emphases added.)

In view of this unambiguously irrevocable power of attorney, intervenors' conclusory allegation that the POA was terminated is baseless: one cannot achieve by mere *fiat* what one has assigned away the power to do.

The allegation in ¶ 34 of the proposed Complaint, "there has never been a legally binding assignment of any interest owned by Liner in any assets, causes of action, or claims to Ewers," is flatly false. The Compensation Agreement dated May 3, 2002 (*see* Exhibit 4), states:

> "Liner does hereby assign, transfer, and convey to [Ewers], fifty percent (50%) ***interest in and to the Bankruptcy Claim***, including, without limitation, fifty percent (50%) of all sums to be received by Liner as a result of the compromise, settlement, resolution, execution, or collection of the Bankruptcy Claim."

Again, in view of this unequivocal assignment, there is no conceivable basis in fact or law for the crucial allegations of ¶¶ 34 and 36 of the proposed Complaint. Without those key allegations, intervenors' proposed Complaint is subject to dismissal as a matter of law.

### (a) The Power Of Attorney Is Irrevocable Under Texas Law.

The POA, by its terms, "shall be construed pursuant to the laws of the State of Texas." It is settled Texas law that "a power of attorney to collect a claim by bringing suit on it is not revocable at the will of the principal, if the principal has conveyed to the agent a part of the claim or cause of action." 3 Tex. Jur. 3d Agency § 35 (App. Tab 1).[4] More broadly, "an agency or power of attorney is generally irrevocable whenever it is coupled with an interest." 3 Tex. Jur. 3d Agency § 34 (App. Tab 2). *See* Nelson v. Consumers County Mutual Ins. Co., 326 S.W.2d 535, 538 (Tex. Civ. App. 1959) (finding power of attorney irrevocable when contained in a mortgage granted to mortgagee) (App. Tab 3); Bowles v. Bryan, 247 S.W. 276, 277 (Tex. Comm'n App. 1923) ("The general rule is that a power of attorney, coupled with an interest, cannot be revoked by the grantor of the power") (App. Tab 4); Bryan v. Ross, 214 S.W. 524, 525 (Tex. Civ. App. 1919) ("where the power is given as security, or is coupled with an interest, then it is irrevocable") (App. Tab 5); Gulf, C. & S. F. Ry Co. v. Miller, 53 S.W. 709 (Tex. Civ. App.

---

[4] An Appendix ("App.") of Texas authority is submitted herewith for the Court's convenience.

1899) (holding "a power of attorney to collect a claim by bringing suit on it is not revocable at the will of the principal, if the principal has conveyed to the agent a part of the claim or cause of action") (App. Tab 6). Arrangements such as that between Liner and Ewers have been found irrevocable at the will of the grantor of the power of attorney under similar circumstances, especially where "one of the purposes of the granting of the power is to secure the agent in the payment of compensation for such services and expenses incurred." Bryan v. Ross, 214 S.W. at 525. Here, the Compensation Agreement recites, among the reasons for execution of the agreement, "WHEREAS ... Ewers has provided to Liner personal services and financial support in the investigation and prosecution of the Bankruptcy Claim...." This is precisely the situation contemplated in Bryan, in which a power of attorney was held irrevocable.

The Compensation Agreement pre-dated the POA.[5] Thus, Ewers had an interest in the Bankruptcy Claim well before Liner granted him Power of Attorney concerning that claim, and Ewers' interest in the claim was independent of the POA. The combination of the irrevocable POA and Ewers' assigned interest in the Bankruptcy Claim renders the POA irrevocable under Texas law, despite Liner's vain wishes or instruction to the contrary.

Among the many reprehensible facts about intervenors' unsubstantiated allegations is that they have known about the irrevocability of the Liner Power of Attorney for quite some time.[6]

---

[5] The Compensation Agreement was entered into on May 3, 2002 and effective as of July 1, 2001; an earlier such agreement had been executed in 2000. This Agreement granted Ewers an unconditional "fifty percent (50%) interest in and to the Bankruptcy Claim." The POA was executed June 15, 2002, although effective as of January 11, 2002.

[6] Liner, Pladott and the Trustee in Bankruptcy have long been in possession of two legal opinions concerning the irrevocability of the POA. One was written by attorney Charles A. Sharman and sent to Ms. Sarah Calhoun, Liner's purported attorney in fact, with a copy to Liner, on May 26, 2004. Sharman also sent such an opinion letter to Thomas R. Hilberth, a purported "proceeds assignee" of Liner, with copies to Liner and to the Trustee, on June 10, 2004. A second opinion, dated May 7, 2004, was provided to the Trustee by attorney R. Bruce Buckley, a partner in the firm Buckley, Mathews, White & Howell LLP. Buckley opined that the POA "is irrevocable and coupled with an interest, and can only terminate upon the full and final adjudication, resolution, settlement, and disposal of the Heron Claims;" that "Ewers has the powers enumerated in the [POA] to the exclusion of all other persons or entities, including Liner;" and that "Liner cannot assign ... that which he has already exclusively and irrevocably assigned to

Indeed, Pladott has explicitly <u>agreed</u> that the Power of Attorney is irrevocable. By letter dated June 3, 2004, <u>Pladott</u> himself stated to the Trustee in Heron's Bankruptcy:

> "Per the legal advice that Ewers has already obtained in the U.S., ***Liner cannot legally revoke this power-of-attorney.***"

*See* <u>Exhibit 5</u>. On June 22, only weeks before the Motion to Intervene, Pladott e-mailed Ewers:

> "I propose you file an ex-parte motion with the court for a temporary injunction against Liner with a simple limited scope: that ***Liner cannot directly or indirectly alter, modify or revoke your Power-of-Attorney*** prior to the final ruling in the case before the court."

*See* <u>Exhibit 1</u>. Pladott's position, expressed so recently, was and remains correct: it is his self-serving change of heart that is inexplicable and sanctionable. <u>No</u> authority has been offered which would suggest any change in the underlying governing law of Texas. <u>No</u> rationale for Pladott's change of legal position between June and July has been offered.

### (b) <u>Ewers Is Not In Breach of Any Agreements With the Intervenors.</u>

Intervenors do not allege, and cannot allege, that Ewers has breached the January 29, 2003 or May 5, 2003 Agreements referred to in ¶¶ 39 – 42 of their Complaint. In view of the failure of intervenors' allegations concerning the revocation of the POA, Ewers' *bona fide* interest in Liner's claims against Heron, and intervenors' failure to allege any breach by Ewers of any of the agreements among Ewers and intervenors, their attempt to intervene must be denied.

### (c) <u>The Intervenors Are In Breach of Their Agreements With Ewers, and These Breaches Are the Subject of Litigation Pending in State Court in Texas.</u>

Whereas Ewers is not in breach of any of his agreements with Liner or Pladott, they are decidedly in breach of their agreements with him.

---

Ewers." This opinion is especially significant, since the law firm, Buckley, Mathews, White & Howell LLP, was, on information and belief, Liner's own law firm in connection with the POA.

### (i) Liner's Breaches and Litigation Arising Therefrom.

Liner is in breach of both the Compensation Agreement and a Non-Disclosure Agreement dated May 3, 2002. In the Compensation Agreement, Liner agreed "to reimburse EPD [Ewers' company] for all sums expended in the investigation and prosecution of the Bankruptcy Claim...." Liner has never reimbursed Ewers. In the Non-Disclosure Agreement, Liner agreed:

> "Information provided by one Party shall not be disclosed or released by the other Party to any third party.... All information exchanged between the parties shall be kept strictly confidential.... The Parties agree that the unauthorized disclosure of confidential information in breach of this agreement shall entitle the non-disclosing party to liquidated damages in the full amount of payments received by the disclosing party under the [Compensation Agreement]."

Liner has breached the Non-Disclosure Agreement in wholesale fashion, not merely disclosing confidential information, but making outrageous and criminal misrepresentations concerning the Heron Bankruptcy Proceedings and Liner's expectancy interest therein.[7] As a result of Liner's breaches of the Compensation Agreement and the Non-Disclosure Agreement, in 2003, Ewers commenced the case E.P.D. Management Company, L.L.C. and Larry Ewers v. Howard Eugene Liner, No. 2003-33307, pending in the District Court of Harris County, Texas (the "Liner Action"). (*See* Exhibit 8.)

---

[7] *Liner was indicted* in the Federal District Court for the District of Minnesota, tried, and, on September 16, 2003, *convicted* on nineteen (19) counts, including false statements and wire fraud, for these and other misrepresentations. *See* Exhibits 6 and 7. The Indictment, in United States of America v. Howard Eugene Liner, Crim. 03-78, as well as a civil lawsuit brought by two Sioux Indian tribes, allege among other things, that Liner had defrauded the tribes and other investors of in excess of $1,000,000; that Liner had falsely stated to an FBI Special Agent "that he had been successful in a lawsuit in England and had recovered all investors' funds;" "that he would repay all investors within 30 days;" that Liner engaged in a "scheme and artifice ... to fraudulently obtain money from investors;" that Liner "divert[ed] funds ... for his own personal use and benefit" and so forth. *See* Exhibit 6. Liner attempted to involve Ewers in his scheme by preparing, for fraudulent and self-serving purposes, letters to Ewers, including a letter dated eight (8) days after Liner's indictment, containing such statements as "it is my understanding that some or all of the Bankruptcy estate will be disbursed to satisfy my claim in the near future." Liner would then, we believe, show these letters to defrauded investors in order to buttress his false excuses for non-payment. When Ewers began received communications from Liner to "instruct the Bankruptcy Court to transmit ... $25,000,000" to attorney Tom Kummer, and letters from defrauded investors, a week after Liner's indictment, "expecting funds to be deposited any second," and when Ewers learned that Liner had been indicted, it is unsurprising that Ewers ceased communication with Liner.

The Liner Civil Action states claims for breach of the Non-Disclosure Agreement, breach of the Compensation Agreement, a Declaratory Judgment "that the power of attorney coupled with an interest given to Ewers by Liner is irrevocable and that Liner's attempts to revoke the power of attorney are of no force or effect," and attorneys' fees.

### (ii) Pladott's Breaches and Litigation Arising Therefrom.

Pladott has entered into a series of oral and written agreements with Ewers. Ewers commenced the case Larry Ewers v. Alexander Pladott, No. 2004-43354, pending in the District Court of Harris County, Texas (the "Pladott Action"), alleging breach of contract by virtue of Pladott's failure to shoulder his share of the legal fees and investigation fees expended by Ewers in pursuit of creditors' claims against Heron. (*See* Exhibit 9.)

The Pladott Action also contains a claim that "Pladott fraudulently induced Ewers to enter into the contract by misrepresenting that he was paying his share of [U.K. Solicitor Anthony] Feldman's legal fees and would continue to do so." Ewers believes that Pladott did not pay his share and has failed to pay his share of the fees of successor counsel in the Heron U.K. Bankruptcy Proceedings. The Pladott Action further alleges that Pladott has failed and refused to pay anything toward the legal fees incurred in this case, and seeks rescission of any obligation on Ewers' part to share any proceeds which may eventually be realized as a result of the debt that Ewers is owed by Heron. Thus, these issues are already under state court adjudication.

### (iii) The Liner and Pladott Actions Pending in the State Courts in Texas Should Be Accorded Comity.

The Compensation Agreement between Liner and Ewers provides that "This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the substantive and procedural laws of the State of

Texas." The Power of Attorney between Liner and Ewers provides that it "shall be construed pursuant to the laws of the State of Texas." The Agreement dated April 24, 2003 between Ewers and Pladott provides that any "breach of this Confidentiality clause shall be determined by a Court of competent jurisdiction under the laws of the State of Texas," and "this Agreement shall be interpreted and construed under the laws of the United States of America and under the laws of the State of Texas." Intervention in this case would raise the risk of inconsistent adjudications as to essential issues of Texas law, including the irrevocability of the Liner Power of Attorney and Pladott's obligations to Ewers.

## II.   Intervenors' Motion to Intervene Must Be Denied as Untimely Under Either Fed.R.Civ.P. 24(a) or (b).

Although intervenors' Motion to Intervene appears to suggest, by omission, that the only requirements for intervention as a matter of right or permissive intervention are those enumerated in their motion, the express terms of both Fed. R. Civ. P. 24(a) and (b) also require intervenors' application to intervene to be "<u>timely</u>."[8] This timeliness requirement "is of great importance," and "the more advanced the litigation, the more searching the scrutiny which the motion must withstand." <u>Banco Popular de Puerto Rico v. Greenblatt</u>, 964 F.2d 1227, 1230-31 (1st Cir. 1992). <u>Banco Popular</u> and subsequent cases enumerate four factors under which the timeliness of Plaintiff-Intervenor's application must be evaluated:

> "(1) the length of time the applicant knew or reasonably should have known that its interest was imperiled before it moved to intervene;

---

[8] Fed. R. Civ. P. 24 (a) "Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties"; Fed. R. Civ. P. 24(b) "Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. ... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

(2) the foreseeable prejudice to existing parties if intervention is granted;

(3) the foreseeable prejudice to the applicant if intervention is denied; and

(4) idiocratic circumstances which, fairly viewed, militate for or against intervention."

964 F.2d at 1231; Navieros Inter-Americanos, S.A. v. M/V Vasilia Express, 120 F.3d 304, 321-22 (1st Cir. 1997); Harvey v. Veneman, 2004 WL 1570126, at * 1, --- F.R.D. ---, --- (D.Me. 2004); Warminster Invest. Corp. v. Horizons Hotels Corp., 191 F.R.D. 48, 50 (D.P.R. 1999); Cabot LNG Corp. v. Puerto Rico Electric Power Authority, 162 F.R.D. 427, 429 (D.P.R. 1995).

Considering the advanced stage of this litigation, with Applications for Default Judgments pending against all defendants, "searching scrutiny" of each of these factors leads to the inevitable conclusion that intervenors' Motion to Intervene must be denied.

### 1. Intervenors Have Been Fully Informed Of These Proceedings and Thus Knew Or Reasonably Should Have Known That Their Interests Were Allegedly "Imperiled" Since At Least October 27, 2003, If Not Sooner.

Intervenors have been kept fully informed of this case since well before its inception on January 7, 2004. Larry Ewers has at all times been open and candid, he has operated with full "transparency," and he specifically sought and obtained the approval of the Trustee, who represents the creditors, and Pladott's direct approval, prior to commencing this litigation. The Intervenors could have participated in the litigation at any time they wished. They simply refused, and refused to share in the costs.

The history of Ewers' disclosures to the Trustee and the would-be Intervenors is telling:

- Pladott e-mailed Ewers on October 14, 2003: "Concerning Boston, while we were there I explained the reasons why I cannot participate in your financial effort in there. Please be assured that I, like you, look forward to winning the war.") See Exhibit 2.
- By letter dated October 27, 2003, cc to Ewers, Pladott himself informed Harris of the possibility contemplated by all parties that Ewers would institute litigation in Boston

- 11 -

against Heron. Pladott sought the Trustee's "cooperation" *vis a vis* such litigation. *See* Exhibit 10.

- By e-mail dated December 11, 2003, nearly a month in advance of the filing of this litigation, *cc* to Pladott, Ewers wrote to the Trustee in Bankruptcy, explicitly seeking his advice on nine specific questions, including: (1) Ewers' ability to "file as a creditor against Heron in a civil (U.S. Federal Court) proceeding in the U.S."; (2) Ewers' ability to "file a contract action (i.e., a lawsuit on the Settlement Agreement) against Heron in a proceeding in the U.S."; (3) – (5) whether there existed any "automatic stay" which might bar the Boston Litigation; (6) whether Ewers could "proceed on your [the Trustee's] behalf ... in order to marshal or collect against assets of Heron's in the U.S."; (7) – (8) what authorization would be required to proceed. *See* Exhibit 11. Ewers *cc'd* Pladott and the Trustee represented all of the creditors.

- By letter dated December 15, 2003, Ewers <u>reiterated</u> all nine questions to the Trustee's Counsel, Pike. *See* Exhibit 12. Ewers *cc'd* both the Trustee and the purported representative of the intervenors, Pladott.

- On December 22, 2003, the undersigned counsel to Ewers had a detailed discussion of the issues with the Trustee's counsel, Mr. Pike, as a result of which Ewers was authorized to proceed with the Boston Litigation.

- On December 23, 2003, Ewers sent the Trustee a letter containing "a full report of all activities ongoing in US Federal Court (Boston, Mass. USA) related to Christopher Patrick Heron.... This was done in my name only, with no liability to yourself...." *See* Exhibit 13. Again, Ewers *cc'd* Pladott. Ewers informed the Trustee of the upshot of Pike's legal advice, and reported that "it was decided to file a claim of action against Heron in the USA in my name only." Ewers duly reported that he had "discussed this with Pladott who concurred in its totality." *See* Exhibit 13. In closing, Ewers stated:

    > "At no time have we, or will we do anything that is not in the best interest of you as Trustee in Heron's Bankruptcy, petitioning creditors, and supporting creditors. At each step we have sought advice from you as Trustee [and] Pladott, representing the supporting creditors, before any claim of action was taken.... this is not a claim of action for the benefit of one party over the others, but a claim of action for the benefit of each of the creditors as Trustee you represent.... I will ... provide updates and ... keep the parties fully informed. Pladott and I are in daily communication and each step he is fully informed prior to any actions being taken. I will keep you informed as you deem necessary in conducting your duties as Trustee. ***I trust you will agree with the legal opinions given, and will assist us fully in our pursuit to recover assets belonging to Heron. It is most important to have your full support and cooperation.*** Our goal from day one has been to recover funds owed by Heron to the creditors."

- By e-mail to both Ewers and Pladott on January 6, 2004, the Trustee, Harris, confirmed his earlier statements of support: *"you may rest assured of my continuing wish to assist you [both] in your endeavours* ... since clearly the position truly is that you are assisting me as trustee." See Exhibit 14.

- On January 14, 2004, the undersigned counsel wrote to the Trustee, (*see* Exhibit 15), with respect to the preceding January 6 e-mail from the Trustee:

  > "I appreciate your support of the U.S. proceeding and your kind offer of assistance. With respect to the reassurances to which you referred in your letter, Ewers asked me specifically to confirm to you that Mr. Ewers will be responsible for the costs of the litigation in Boston, and neither you nor Valentine & Co. will have any liabilities in respect of such costs.... If we may be of any assistance to you, or if at any time you would like further information concerning the proceedings in the United States, please do not hesitate to call, write or e-mail me directly. You may be assured of our complete cooperation and assistance to you."

- The Trustee's counsel thanked the undersigned for the January 14 letter on behalf of the Trustee by letter of January 19, 2004, stating "I am very grateful to you for the helpful information," and requesting that you "let me know of any developments in [the Boston] litigation (or any other of which you are aware)." See Exhibit 16.

- The Trustee and his counsel were provided with copies of the Complaint in the Boston Litigation.

- The Trustee and his counsel were provided with routine updates concerning events in the Boston Litigation, and were promptly provided with responses to any inquiries they made. By way of example only, the Trustee's counsel requested by letter dated February 19, 2004 that Ewers' counsel "update me on the present position in relation to the litigation commenced against Christopher Patrick Heron and others"; such update was sent by e-mail on February 24, 2004.

- Ewers also routinely updated Pladott on events in this case, informing him of its filing, of service of process on the defendants, and on events such as "We are filing for a default and a motion for a real estate attachment in Pomeroy's home county." See Exhibit 17. Pladott routinely monitored the case on PACER.

- Pladott even wrote the Trustee and his counsel, on March 23, 2004: "Are you suggesting that since nothing is going to happen with our case in the UK, *we should devote our time and money to the US litigation?*" See Exhibit 18.

BOS_456051_2/KNOURSE

At no time did Pladott, Harris, or Pike ever express any retraction of their consent to the prosecution of this case. In reliance upon their express approval and knowing acquiescence, Ewers pursued this litigation vigorously, and bore 100% of the burdens and costs.

These and other numerous other communications among Ewers, Harris, Pike and Pladott belie the intervenors' contention that they were unaware that their interests were "imperiled" by this case, well before their recent Motion to Intervene.

### 2.    Ewers Will Be Prejudiced If Intervention Is Granted.

Ewers, who has an irrevocable 50% interest in the claims in this case, stands to lose valuable ground in his attempts to recover funds due him and intervenors through the unnecessary delay imposed by intervention. Ewers is on the verge of obtaining default judgments. The addition of intervenors' unsubstantiated claims, exposed in Section I, *supra*, would frustrate Ewers' attempts to collect under the Compensation Agreement, and would even delay intervenors' own collection from Heron.

### 3. The interests of intervenors Will Not Be Prejudiced if Intervention Is Denied.

As evidenced by the default judgments that Ewers is poised to obtain against defendants in this case, Ewers has aggressively prosecuted this suit. The absence of intervenors has not hindered, and will not hinder, the recovery of funds due them. Instead, their intervention will impede those efforts by introducing baseless and unnecessary complexity to this litigation.

Intervenors' allegations in this respect amount to no more than sheer speculation that Ewers might, after obtaining judgment, levy upon unidentified assets of defendants, to their exclusion. Intervenors do not identify any such assets. Intervenors have the same ability to file suit against defendants, obtain judgment and seek to discover hidden assets as does Ewers. They have chosen not to expend the resources to do so. Denying intervenors the ability to ride on

Ewers' coattails does not prejudice them. In substance, their allegations amount to no more than their anticipatory fear, unfounded, that Ewers might violate agreements. As Ewers is not now and never has been in breach of the January 29 or May 5 Agreements referenced in ¶¶ 39 – 42 of intervenor's proposed Complaint, the Motion to Intervene is little more than an impermissible attempt to have this Court issue an advisory opinion (concurrently with the Texas state courts presently adjudicating the issues) as to what Ewers' responsibilities might be if, hypothetically, assets were ever found upon which to levy.

### 4. Idiocratic Circumstances Of This Case Militate Against Intervention.

As matters presently stand, Ewers has funded this litigation wholly on his own, with intervenors' knowledge, since its inception, and despite their failure and refusal to make any financial contribution. Ewers has efficiently pursued the litigation to the edge of default judgments. Only at this late point have intervenors chosen to intervene, in a hostile rather than cooperative way, making accusations in their proposed Complaint, discussed below, that are wildly untrue, and that threaten to undermine everything Ewers has accomplished to date.

### III. Intervenors Should Not Be Permitted To Intervene Under Fed.R.Civ.P. 24(A) Because Their Interests Are Adequately Represented By Ewers.

Contrary to intervenors' contention (Motion to Intervene, p. 8) that their burden to demonstrate the inadequacy of Ewers' representation of their interests is "minimal," "adequate representation is <u>presumed</u> where the goals of the applicants are the same as those of the plaintiff or defendant." <u>Daggett v. Comm'n on Gov'l Ethics and Election Practices</u>, 172 F.3d 104, 111 (1st Cir. 1999) (citing <u>Moosehead Sanitary Dist. v. S.G. Phillips Corp.</u>, 610 F.2d 49, 54 (1st Cir. 1979) ("Where the party seeking to intervene has the same ultimate goal as a party already in the suit, courts have applied a presumption of adequate representation.")) As further discussed in

Section IV, below, the allegations found in intervenors' proposed Complaint concerning any adversity of interest among Ewers and intervenors are unfounded in fact or law, without merit, and subject to dismissal as a matter of law.

Nowhere in their Motion to Intervene and proposed Complaint do intervenors allege that they do not have an interest identical to Ewers' in the recovery of monies due them from Heron. In fact, in their Motion to Intervene, p. 3, intervenors represent that their "interests as creditors of Heron are in the assets of Heron, the very property which is being sought by Ewers in the Complaint." Under the terms of the Compensation Agreement, excerpted above, Ewers clearly has that same interest, which he has asserted.

Of equal importance is the requirement that intervenors adduce something more than accusations unsupported in fact or law, "especially where as here the purported inadequacy amounts at best to an equitable claim to proceeds as yet unrealized." Moosehead Sanitary Dist., 610 F.2d at 54. Given that intervenors seek little more than an equitable claim to those funds in the form of a constructive trust in their favor, their Motion to Intervene must be denied.

### IV. Intervenors Should Not Be Permitted To Intervene Under Fed. R. Civ. P. 24(b) Because Such Intervention Will Unduly Delay And Prejudice The Adjudication Of Ewers' Rights.

Ewers instituted this litigation because, by operation of the Compensation Agreement and the POA, he possesses an irrevocable interest in funds payable to Heron's creditors. The last-minute addition of intervenors as parties to the Boston Litigation would unduly delay and prejudice the adjudication of Ewers' rights. As events stand, Ewers is on the verge of obtaining default judgments, under which Ewers may collect and distribute funds to entitled intervenors. Since the interests of intervenors are identical to Ewers', who adequately represents those

interests, the unnecessary addition of intervenors to the Boston Litigation will delay the recovery of monies owed Ewers as well as intervenors.

## V. Intervenors' Proposed Complaint Contains Unfounded Allegations That Could Subject Them To Rule 11 Sanctions.

As discussed in Section I, above, intervenors' proposed Complaint contains allegations unsubstantiated by either fact or law. Such allegations are sanctionable under Fed. R. Civ. P. 11, and further support Ewers' position that intervenors' Motion to Intervene must be denied. See Lancellotti v. Fay, 909 F.2d 15, 19 (1st Cir. 1990). Among the numerous false allegations in the intervenors' proposed Complaint are the following, which list is not exhaustive:

¶ 8: "Plaintiff-Intervenor Flamecrest Enterprises Limited Trust ... is a trust duly organized and validly existing under the laws of the United Kingdom."

FALSE. On information and belief, Flamecrest was struck off in 2001, and has been liquidated. *See* Exhibit 19.

¶ 31: "In paragraph 2 of the Complaint, Ewers alleged that he was the sole plaintiff and party in interest with respect to the causes of action alleged in the Complaint."

FALSE. Paragraph 2 merely recites that Ewers "is a U.S. citizen residing in Corpus Christi, Texas." Ewers' Complaint repeatedly alleges the existence of the other creditors. *See, e.g.,* ¶ 10 ("Heron entered into a Settlement with four such defrauded creditors, including ... Liner"); ¶ 12 ("Heron agreed ... to pay the creditors..."); ¶ 20 (Heron failed to pay "his creditors"); ¶ 22 ("Pursuant to an Exclusive Power of Attorney ... Ewers became and remains the sole and exclusive attorney-in-fact for Liner..."); ¶ 24 (On his List of Creditors ... Heron listed the Liner debt, for which Ewers is attorney-in-fact..."); ¶ 39 ("Pomeroy and Heron entered into a conspiracy to fraudulently conceal ... assets ... from Heron's creditors, including Ewers"); ¶ 51 ("Heron transferred assets ... with the intent to hinder, delay and defraud creditors, including Ewers"). Ewers has even filed the Settlement Agreement among all of the parties in this Court.

¶ 33: "Ewers has no interest in the causes of action set forth in the complaint except as Liner's attorney in fact."

FALSE. The Compensation Agreement dated May 3, 2002 states: "Liner does hereby assign, transfer, and convey to [Ewers], fifty percent (50%) *interest in and to the Bankruptcy Claim*, including, without limitation, fifty percent (50%) of all

- 17 -

sums to be received by Liner as a result of the compromise, settlement, resolution, execution, or collection of the Bankruptcy Claim." *See* Exhibit 4. The intervenors' repetition of this blatant falsehood is inexplicable and sanctionable.

¶ 34:  "There has never been a legally binding assignment of any interest owned by Liner in any assets, causes of action, or claims to Ewers."

>   FALSE. *See* discussion immediately preceding with respect to ¶ 33.

¶ 36:  "The Power of Attorney was terminated effective July 16, 2004."

>   FALSE. The Power of Attorney is irrevocable as a matter of law. Plaintiff Alex Pladott knows that the allegation is false and has asserted the contrary, in writing.

¶ 37(b):  "Ewers misrepresented ... that he had received an assignment of causes of action and claims rightfully belonging to Liner."

>   FALSE. Again, the repeated falsehood regarding the absence of an assignment tears the fabric of the intervenors' case and undermines their credibility.

¶ 37(d):  "Ewers has used the Power of Attorney in an attempt to secret assets of Heron from the Bankruptcy Court in the United Kingdom and the Trustee in Bankruptcy appointed thereby."

>   FALSE. The Trustee is and has from the inception of this case been fully informed concerning the institution and prosecution of this case. If this case were "an attempt to secret assets ... from the Trustee," it is baffling why the Trustee's advance approval was sought and the Trustee was provided with the Complaint and frequent updates.

¶ 54:  "Upon information and belief, Ewers transferred assets to his own account or for his benefit which rightly belong to Plaintiff-Intervenors ... with the intent to hinder, delay and defraud Plaintiff-Intervenors."

>   FALSE. This outrageous allegation has no basis in fact. The Court should explore whether there was any good-faith basis for its assertion.

## VI. Many of the Purported Intervenors Do Not Have Standing.

### A. Howard Eugene Liner Has No Standing.

As discussed above, Liner's Power of Attorney provides:

> "I hereby ratify and confirm that my sole and exclusive Attorney-In-Fact and Mandate shall lawfully do, or cause to be done by virtue of this

BOS_456051_2/KNOURSE

>Exclusive Power of Attorney and Mandate along with the rights and powers granted herein, ***all acts necessary in the prosecution of the claims asserted in the referenced matter and the rights granted under said contracts. Said Attorney-In-Fact and Mandate shall have the powers set forth herein to the exclusion of all other persons or entities, including myself, my heirs and assigns.***" (*See* Exhibit 3.)

Ewers' powers with respect to the prosecution of the claims against Heron is "exclusive" – "to the exclusion of all other persons or entities," including Liner himself. Liner has no standing.

## B. The So-Called "Creditors Committee" Has No Standing.

Paragraph 6 of the intervenors' proposed Complaint alleges that the creditors' committee is a committee duly appointed on July 22, 2004. However, this "meeting," orchestrated by Pladott, was premised – as is the intervenors' Complaint – on the insupportable basis that Liner's Power of Attorney had been revoked. Given that the Power of Attorney is, as a matter of fact and law, irrevocable, this so-called "Creditors Committee" was neither duly appointed nor duly constituted. Ewers has the exclusive power to act with respect to 71.49% of the debt owed by Heron. Thus, no so-called "Creditors Committee" constituted without him has any validity.

In addition, ¶ 6 alleges that the creditors' committee was appointed "to act on behalf of the Estate in Bankruptcy of Christopher Patrick Heron." However, under U.K. law, the creditors' committee has no power to act on behalf of the Estate in Bankruptcy of Christopher Patrick Heron: all powers concerning the Estate in Bankruptcy of Christopher Patrick Heron vest in the Trustee in Bankruptcy; the creditors' committee perform a sanctioning role, but under U.K. law, unlike U.S. law, has no power to take actions in its own right or standing. Insolvency Act of

BOS_456051_2/KNOURSE

1986, §§ 301, 305, 306.[9] Therefore, the so-called "Creditors' Committee" has no standing to act as plaintiff intervenors.

## CONCLUSION

For the foregoing reasons, Plaintiff Ewers respectfully requests that this Court deny intervenors' Motion to Intervene.

LARRY EWERS,

By his attorneys,

Alan M. Spiro  (BBO No. 475650)
EDWARDS & ANGELL, LLP
101 Federal Street
Boston, Massachusetts  02110
(617) 439-4444

Dated:  August 25, 2004

## CERTIFICATE OF SERVICE

I, Alan M. Spiro, hereby certify that on August 25, 2004, I served a true copy of the above document by hand upon Charles P. Kazarian, counsel for intervenors, at 77 North Washington Street, Boston, Massachusetts 02114, and by first class mail, postage pre-paid, upon all other parties to this case.

Alan M. Spiro  (BBO No. 475650)

---

[9] Section 305 provides that the function of the Trustee is to get in, realize and distribute the bankrupt's estate. It is not the function of the creditor's committee to do this. Section 306 provides that the bankrupt's estate shall vest in the trustee immediately upon his appointment taking effect; the estate does not vest in the creditor's committee.

- 20 -