UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 OCT 20 P 1: 24

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| LARRY EWERS,<br><br>    Plaintiff,<br><br>v.<br><br>HOWARD EUGENE LINER, CREDITORS COMMITTEE OF THE BANKRUPTCY ESTATE OF CHRISTOPHER PATRICK HERON, AH PING BAN, FLAMECREST ENTERPRISES LIMITED TRUST, BALZ RUDOLPH WOLFENSBERGER TRUST,<br><br>    Plaintiff-Intervenors,<br><br>v.<br><br>CHRISTOPHER PATRICK HERON, CORPORATION OF THE BANKHOUSE, INC., SOCIETE BANKHOUSE, and JAMES F. POMEROY, II,<br><br>    Defendants. | CIVIL ACTION NO.<br>04-10024-RWZ |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE OF AH PING BAN, FLAMECREST ENTERPRISES LIMITED TRUST, AND BALZ RUDOLPH WOLFENSBERGER TRUST, AND RESPONSE TO PLAINTIFF'S OPPOSITION**

PROCEDURAL HISTORY OF THE INTERVENTION

On January 4, 2004 Larry Ewers (hereafter "Ewers" or "plaintiff") filed the Complaint in the instant action (the "Complaint"). On June 4, 2004 the Court entered a default against Defendants. Pursuant to Rules 24(a) and 24(b), Fed.R.Civ.P., Howard

Eugene Liner ("Liner"), the Creditors Committee Of The Bankruptcy Estate Of Christopher Patrick Heron, Ah Ping Ban, Flamecrest Enterprises Limited Trust, and Balz Rudolph Wolfensberger Trust ("Plaintiff-Intervenors") moved for leave to intervene in the above-captioned matter (the "Intervention Complaint"). A <u>Memorandum In Support Of Plaintiff-Intervenors' Motion To Intervene</u> accompanied the Motion. On August 25, 2004 Plaintiff, Larry Ewers, filed <u>Plaintiff's Opposition To Motion To Intervene</u> (the "Opposition To Intervention"). There has been no opposition to the Intervention Motion by any defendant.

This Memorandum is supplemental to that which accompanied the Intervention Motion and filed in anticipation of the Court setting a hearing on the Intervention Motion.

## STATEMENT OF RELEVANT FACTS

In the Opposition To Intervention, plaintiff has neither admitted nor denied the factual allegations set forth in the Intervention Complaint as required. Therefore, the factual allegations in the Complaint must be deemed admitted. See e.g., <u>Southwest Ctr. for Biological Diversity v. Berg</u>, 268 F.3d 810, 818 (9th Cir. 2001). The facts are affirmed and supplemented by sworn affidavit of Alexander Pladott, attached hereto and incorporated herein by reference as <u>Exhibit 1</u>. The facts can be stated as follows:

In July 2001, Pladott organized a group of four creditors who were owed monies by the Defendant Christopher Patrick Heron ("Heron") in order to initiate litigation against him in the United Kingdom ("UK"). <u>Pladott Affidavit</u>, ¶ 1. With the approval of the then representatives of the four creditors, he initiated and issued a Memorandum of Understanding ("MOU") dated December 24, 2001, <u>Pladott Affidavit</u>, Exhibit A, to memorialize what had been agreed. Plaintiff Larry Ewers, representing the Liner group,

2

informed Pladott he had learned of banking information for funds belonging to Heron in the United States and Canada. He explained that under a "confidentiality agreement" he had signed with an entity (whose identity he refused to disclose) that had actually located Heron's two bank accounts he could not disclose that information to anyone. Pladott Affidavit, ¶ 2. Ewers and Pladott generally agreed to pool their efforts to undertake a complicated, delicate collection effort against Heron's funds world-wide, but focused primarily on solidifying the Heron creditors' position to pursue the funds in New York and Canada which Ewers had already learned about. Pladott and Ewers both expended time, money and great effort solidifying their position in the UK. See generally, Pladott Affidavit. Ewers took it upon himself to finance all expenses connected with the recovery of the Heron assets in the U.S. See, e.g., Exhibit 2 attached hereto, January 14, 2004 letter from Alan Spiro, Esq.

On January 17, 2002, Pladott initiated negotiations with defendant Heron which culminated in a Settlement Agreement with him (the "Heron Settlement Agreement"). Pladott Affidavit ¶ 6, Exhibit C. The four original creditors of Heron ("the Heron Creditors") who entered into the Heron Settlement Agreement are:

A. Howard Eugene Liner ("Liner")

B. Ah Ping Ban ("Ban")

C. Flamecrest Enterprises Limited Trust ("Flamecrest")

D. Balz Wolfensberger Discretionary Trust ("Wolfensberger").

Pladott has no direct relationship to Liner, but with regard to the other three creditors, he has an irrevocable power-of-attorney from Ban, and is an authorized trustee

3

of Flamecrest and Balz Wolfensberger. Pladott Affidavit ¶ 8. These three entities are henceforth referred to as the "BFB Creditors".

In the Heron Settlement Agreement, Heron formally acknowledges his debt of $2,690,000,000 USD ("Heron's debt") to the following creditors:

```
Alex Cho/Liner -   $1,980,000,000.00 USD
Ban -                    $500,000.00 USD
Flamecrest -         $100,000,000.00 USD
Wolfensberger -      $110,000,000.00 USD
```

Heron breached the Heron Settlement Agreement shortly after its execution, and the creditors initiated an action against him in the High Court Of Justice In Bankruptcy in the United Kingdom on June 18, 2002 in the case of <u>In re Christopher Patrick Heron</u>, Case No. 1625 of 2002 (the "Bankruptcy Proceeding"). Heron was adjudicated bankrupt, and the Bankruptcy Estate is being administered by a duly appointed Trustee, Malcolm Harris. (Complaint Paragraph 23; Intervention Complaint Paragraph 10)

The acting solicitor in England for the four creditors issued a document dated June 20, 2002, <u>Pladott Affivait</u>, Exhibit E, that indicated the outstanding amount of the Heron debt, including interest, and the amount Heron owed to each of the four parties/creditors as of June 18, 2002, with a new ratio established based on Exhibit E for the distribution of any funds collected on the Heron debt. Such funds were therefore to be distributed on a "pari-passu" basis, to Cho/Liner at 71.49% and the BFB Creditors at 28.51%. Pladott Affidavit ¶ 9-12.

Pladott and Ewers entered into a series of agreements, dated January 29, 2003, April 19, 2003 and May 5, 2003, Pladott Affidavit Exhibits G-I, none of which called for Pladott to expend any funds up front, but which allowed each of them to recover expenses out of any funds recovered. Ewers regularly provided small amounts of vague

4

information to Pladott regarding the Heron funds that had been located in New York and Canada. (set forth in more detail in <u>Argument</u> below). <u>See</u>, <u>e.g.</u>, <u>Pladott Affidavit</u>, Exhibit J.

On September 14, 2003, Pladott met Ewers in Boston. Ewers wanted money for costs in connection with his wish to intervene in another case, Civil Action No. 02-10532-RWZ, that had nothing to do with Heron and that had already been filed against defendant BankHouse in this court. Pladott expressed the need for additional security for the BFB Creditors as a condition of voluntarily financial assistance. <u>Pladott Affidavit</u> ¶ 19, including full disclosure related to the frozen bank accounts in Heron's name in New York and Canada, a secure process for the distribution of the funds from the two jurisdictions to the BFB Creditors, assurance that all litigation would be filed for and on behalf of the four parties/creditors, and assurance that counsel would be bound to honor the agreements. Ewers refused. <u>Pladott Affidavit</u> ¶ 19.

Thereafter the parties exchanged a series of email messages on the issues of cost, strategy and the New York and Canada litigation. <u>Pladott Affidavit</u>, ¶ 20-32 and exhibits attached thereto. In all of these exchanges, Ewers continued to assert the existence of the New York and Canada litigation, vaguely answered Pladott's questions about them, and clearly expressed to Pladott that the BFB Creditors would not be allowed to join in those lawsuits. See, e.g. February 10, 2004 email message, <u>Pladott Affidavit</u>, Exhibit R. To this day, Ewers has provided no identifying information (case name, docket numbers) for the New York and Canada litigation.

From January 2004 through April 2004, Ewers and Pladott exchanged e-mail and letters culminating in discussion of an escrow agreement and constructive trust with clear

5

distribution instructions, to secure the position of the BFB Creditors. At the end of April 2004, Ewers told Pladott that the escrow agreement was acceptable to him, and that he would sign it. Pladott Affidavit, ¶ 34-35, Exhibit Y. Pladott sent the escrow agreement to Ewers on May 10, 2004. Pladott Affidavit, ¶ 38. Thereafter, Ewers did not sign the escrow agreement, but gave Pladott numerous unreasonable excuses for delaying his execution of it. Pladott Affidavit, ¶ 36.

On July 9, 2004, Ewers filed a Motion For Final Judgment in this court against Heron in the amount of $5,940,000,000 USD in Ewers' favor alone.

On August 5, 2004, Pladott proposed to Ewers that any judgment in this case should be in favor of a constructive trust for and on behalf of Liner, Ban, Flamecrest and Wolfensberger. Pladott Affidavit, ¶ 49, Exhibit Z. He also proposed that the constructive trust be managed jointly by the three trustees and require signatures and instructions from each of the three proposed trustees: Ewers, Pladott, and Attorney Thomas Kummer on behalf of Liner. Pladott further proposed that the three trustees for the constructive trust take over the management of any litigation in any jurisdiction, and that Ewers disclose all pertinent information related to the two jurisdictions in New York and Canada to the other two trustees, and that a default judgment be entered by the court against the Defendants in favor of the creditors.

Ewers did not respond to any of the above.

Ewers filed a complaint in Texas against Pladott, Larry Ewers v. Alexander Pladott, Harris County No. 2004-43354, *after* Pladott filed the BFB Creditors' Intervention Motion. Pladott not been served with the complaint yet. Pladott Affidavit, ¶

6

49. In that complaint, Ewers seeks to rescind the rights of Pladott, and hence the BFB Creditor's, under the agreements that call for sharing of the Heron recovery.

## ARGUMENT

I. The BFB Creditors Are Entitled To Intervene As A Matter Of Right Under Rule 24(a) of the Federal Rules of Civil Procedure.

The BFB Creditors should be allowed to intervene as a matter of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), or, alternatively, permissively pursuant to Rule 24(b) of the Fed.R.Civ.P. The issue before the Court is simply whether the BFB Creditors qualify for intervention pursuant to one of these two rules.

As will be more fully set forth below, the BFB Creditors are entitled as a matter of right to intervene because they: (i) "claim an interest relating to the property or transaction which is the subject of the action"; (ii) the "disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (iii) the applicant's interest is not "adequately represented by existing parties". Rule 24(a) of the Fed.R.Civ.P.

The BFB Creditors have met the three-pronged test for intervention as of right. The Complaint of Plaintiff-Intervenors clearly sets forth the claim of interest of the BFB Creditors, which neither plaintiff nor defendants have challenged. The Affidavit Of Alexander Pladott, attached hereto as Exhibit 1, also clearly sets forth why and how as a practical matter disposition of this action (a judgment solely in the name of plaintiff Larry

7

Ewers) may impair or impede their ability to protect their interest. This, together with the startling fact that plaintiff Ewers has sued Pladott in Texas to *extinguish* the rights of the BFB Creditors demonstrates beyond doubt that the BFB Creditors are not adequately represented by Ewers.

While an applicant bears the burden of establishing each of these Rule 24 (a) requirements, Rule 24 is to be construed liberally and doubts resolved in favor of the proposed intervenor. See e.g., Southwest Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 818 (9th Cir. 2001). Courts accept as true all well-pleaded, non-conclusory allegations in the motion to intervene, and in the proposed complaint. Id. Here, Plaintiff has directly neither admitted nor denied the allegations in the Intervention Complaint, but merely has made certain assertions in Section V of the Opposition To Intervention which perhaps could be construed as constituting a denial. All other factual allegations in the Intervention Complaint must be accepted as true.

II. The Arguments Raised By Plaintiff Are Inadequate To Preclude Intervention By The BFB Intervenors.

Plaintiff offers several arguments in opposition to the Intervention Complaint. They are without merit, as will be explained below. Moreover, the court is asked to keep in mind, as the formal analysis unfolds, the question of why on earth Ewers would spend time, money and effort opposing what will, at the end of the day, merely be a judgment against Heron in the names of *all* of the creditors, and an injunction against his usurpation of the recovery against Heron in other jurisdictions, unless Ewers' goal is to ignore the rights of the other creditors.

A. <u>Timeliness and Prejudice.</u> Plaintiff's opposition on the basis of timeliness is utterly false. He correctly states the law, in that <u>Banco Popular de Puerto Rico v. Greenblatt</u>, 964 F.2d 1227, 1230-31 (1st Cir. 1992) and subsequent cases (further citation omitted) enumerate four factors under which the timeliness of an intervenor's application must be evaluated:

"(1) the length of time the applicant knew or reasonably should have known that its interest was imperiled before it moved to intervene;

(2) the foreseeable prejudice to existing parties if intervention is granted;

(3) the foreseeable prejudice to the applicant if intervention is denied; and

(4) idiocratic circumstances which, fairly viewed, militate for or against intervention."

However, Plaintiff then misapplies the law. Some factual background is necessary, and will be supplied for each of the four factors.

1. <u>Length Of Time</u>. As will be demonstrated below, The BFB Creditors had no reason to believe that Ewers would not adequately represent their interests until July 15, 2004, when they finally had good reason to believe that Ewers intends to cut them out of the Heron recovery, and they acted promptly thereafter. Deception and stalling by Ewers lulled the BFB Creditors into a false sense of security. Ewers' behavior, the realization by Alexander Pladott ("Pladott", who is the fiduciary of the BFB Creditors) of the danger, and the timing of that realization are carefully set forth in the <u>Affidavit of Alexander Pladott</u> attached hereto and incorporated herein as Exhibit 1.

According to information provided to Pladott by plaintiff Ewers, the Heron recovery is anticipated to take place in New York and Canada against funds located in those jurisdictions that belong to Heron. <u>Pladott Affidavit</u>, ¶ 3, ¶ 18 and Exhibit J

9

attached thereto. From the beginning, Ewers has been cagey about the New York and Canada litigation over the funds in Heron's name. Pladott Affidavit, ¶ 3. However, on multiple occasions Ewers fed Pladott small amounts of information on those cases, and he also told Pladott verbally that both cases were "Sealed Level I" so that no one else would be able to access them. Pladott Affidavit, ¶ 18 and Exhibit J attached thereto.

In September 2003 Ewers asked Pladott for financial help with what was initially to be an intervention in another case in this court, Civil Action No. 02-10532-RWZ. Pladott Affidavit, ¶ 19. At the time, the governing document between Ewers and the BFB Creditors as represented by Pladott was the May 5, 2003 agreement referenced in the Pladott Affidavit, ¶ 17, Exhibit I. Nothing in that agreement calls for Pladott to *advance prior to recovery from Heron* any fees for any litigation. Provision is made only for *recovery* of costs off the top of any recovery from Heron. Reliance by Ewers on the May 5, 2003 agreement for the proposition that Pladott agreed to fund any U.S. litigation up front is either wishful thinking or an attempt to mislead the court. Also, as is common with Ewers, he is belied by his own words. In his December 23, 2003 letter to the English bankruptcy trustee, Malcolm Harris (attached to Plaintiff's Opposition to Motion to Intervene, Tab 13), Ewers tells Harris:

> "Having taken the responsibility to fund the litigation in the USA, legal advice given was the sole reason for decision". (emphasis added).

Did Ewers take on the responsibility to fund the US litigation, as he represented to the trustee, or did he not, as he represents to this Court and the Texas court? Perhaps the truth is set forth in a letter from Ewers' counsel in this case, dated January 14, 2004 (Exhibit 2, attached hereto) to the same Mr. Harris, in which counsel states to Harris:

10

"Mr. Ewers asked me specifically to confirm to you that **Mr. Ewers will be responsible for the costs of the litigation in Boston,** and neither you nor Valentine & Co will have any liabilities in respect of such costs."

Pladott, recognizing that he had no arrangement with Ewers to fund the US litigation, responded to Ewers' request for funding by pointing out that in order for him to consider advance payment by the BFB Creditors, Ewers would have to agree to tighten the security features of the relationship between the parties. Ewers refused. Pladott Affidavit, ¶ 19. At this point, and while Ewers was attempting to intervene in the pre-existing case, the BFB Creditors had no reason to be concerned, as Ewers had not yet filed the instant case. He finally did so in January 2004. Even after filing the instant action, Ewers continued to feed information about the New York and Canada matters to Pladott, Pladott Affidavit, ¶¶ 21-32 and Exhibits L-X attached thereto, giving Pladott a level of comfort that Ewers was adequately representing the interests of the BFB Creditors. Pladott Affidavit, ¶ 33.

From January 2004 through April 2004, Pladott exchanged e-mail and letters with Ewers related to the needs of the BFB creditors to secure the distribution of Heron's funds in New York and Canada. Pladott Affidavit, ¶ 34. They discussed an escrow agreement and constructive trust with clear distribution instructions, and all the while Ewers seemed amenable, again thus giving Pladott no reason believe there was a serious problem. It should be kept in mind that during this period, the instant case essentially lay dormant, on default status, with not a shred of the involved, lengthy litigation that underlies the holdings of Banco Popular de Puerto Rico v. Greenblatt, supra, and its progeny.

At the end of April 2004, Ewers verbally agreed to sign an escrow agreement that satisfied Pladott's security concerns. Pladott Affidavit, ¶ 35. On May 10, 2004, in reliance on Ewers aforementioned agreement, Pladott signed and had notarized the escrow agreement (Pladott Affidavit, Exhibit Y) and sent it to Ewers. Ewers never signed it, and gave Pladott a string of excuses for delaying his execution of the escrow agreement. Pladott Affidavit, ¶ 36.

On July 9, 2004, Ewers, having failed to sign the escrow agreement, and no longer communicating with Pladott about the New York and Canada litigation, filed a motion for final judgment in this court against Heron in the amount of $5,940,000,000.00 in Ewers' favor alone. Pladott Affidavit, ¶ 37. Pladott was now *almost* on notice that Ewers was not adequately representing the interests of the BFB Creditors.

On July 15, 2004, Ewers informed Pladott by facsimile that he was retracting the previous agreement and announced for the first time that he would not sign the escrow agreement which Pladott had sent him on May 10, 2004. Pladott Affidavit, ¶ 38. Pladott was only at that point, July 15, 2004, on actual notice that Ewers was not adequately representing the interests of the BFB Creditors. Pladott acted immediately, by bringing the matter to the attention of this Court via a July 19, 2004, letter. Docket Entry No. 17, and the Motion to Intervene followed shortly thereafter, after Pladott was able to engage undersigned counsel.

Nothing in the forgoing factual summary invokes a valid timeliness defense to the motion to intervene. In addition to the fact that Pladott acted virtually immediately upon learning that plaintiff Ewers was not adequately representing the interests of his group, the typical milieu for a timeliness argument is where defendants have been dragged

through litigation by one plaintiff, and invoke a timeliness defense to a motion to intervene filed by a second plaintiff. Here, there has been no defense opposition to the motion to intervene.

2. <u>Foreseeable Prejudice to Existing Parties</u>. The defendants are all on default status. No argument has been made by plaintiff that defendants will suffer any undue prejudice, because none can be made. As to plaintiff, allowance of the motion to intervene will certainly thwart any plans he may have had to take a huge judgment solely in his name to New York and/or Canada, obtain the funds that are frozen there, and fail to honor the May 5, 2003 agreement as to distribution. This would be justice, not prejudice.

Tellingly, plaintiff asserts no prejudice to himself, except in conclusory fashion. He posits that the addition of intervenors would prejudice the "adjudication" of his rights, but he is unable or unwilling to state what that prejudice might be, leaving the Court to guess at it.

Plaintiff's unsupported assertions of prejudice overlook two important points. First, plaintiff himself has never been a direct creditor of Heron. While an entity called EPD Management, LLC seems to have an *assignment* of a portion of Liner's creditor rights against Heron, set forth in a <u>Compensation Agreement</u> attached to plaintiff's opposition at Tab 5, plaintiff has not been candid with the Court about this. For example, in describing the <u>Compensation Agreement</u> to the Court on page 17 of his opposition, Ewers *substitutes* himself for EPD as the beneficiary of the <u>Compensation Agreement</u>, and actually puts his name in brackets in quoting the original to the Court.

It is not known why Ewers elected to mislead the Court in this regard, but it is evocative of another misleading statement he made to this Court. In his original attempt

13

to intervene in 02-10532-RWZ (See Docket Entry #44, paragraph 17 of the section entitled "Facts"), Ewers lied to this Court as to his status in the British bankruptcy proceedings, by asserting that *he* was the petitioning creditor. The *actual* petitioning creditors were Liner and Cho. <u>Pladott Affidavit</u>, Exhibit D attached thereto.

Plaintiff's questionable creditor status stands in sharp contrast to the undisputed standing of the BFB Creditors (and Liner) as direct creditors of Heron. This point is important because, even if plaintiff (somehow instead of EPD) has any recovery right here, it consists of 50% of Liner's right, or doing the arithmetic on the May 5, 2003 agreement, approximately one-third of the total recovery against Heron. Plaintiff has yet to explain why his portion of the recovery has some greater status than the larger portion collectively belonging to the intervenors.

The second point plaintiff ignores is that he would *already* have his adjudication had he not chosen to oppose the motion to intervene by entities who are, for all intents and purposes, his co-venturers, and he should not be heard to rail against the BFB Creditors for his own pointless, dilatory doings. Moreover, plaintiff has failed to explain why he waited until six months after filing suit to seek his default judgment, if delay actually is, as he now claims, a basis for his claim of prejudice.

### 3. Foreseeable Prejudice to Applicants.

The prejudice to the applicants is based mainly upon the fact that plaintiff currently controls all of the information and access in connection with the Heron assets that have been located in New York and Canada. Everything plaintiff Ewers has said and done with respect to the intervenors demonstrates his unfitness to represent their interests, not the least of which is his contention that they should file their own lawsuit. His bald

assertion that intervenors "have the same ability to file suit against defendants, obtain judgment and seek to discover hidden assets as does Ewers" is not only false but illustrates plaintiff Ewer's real intentions: he does not want to be fettered with the rights of the other Heron creditors. The question is: why not?

As set forth above, Ewers has refused to sign an escrow agreement, refuses to make valid assurances that he is not working in secret solely for his own account, refuses to divulge details about Heron's assets in New York and Canada, and refuses to let Heron's original, direct creditors share in the judgment that will be rendered in this case.

By taking the simple, non-invasive action of permitting the requested intervention, the Court will allow intervenors to seek a joint and several judgment against Heron in Boston, and will in a stroke render plaintiff's control of the New York and Canada information somewhat less harmful to applicants. Applicants still will require some minor injunctive relief to compel plaintiff to share what he knows, create the escrow account he agreed to, and otherwise cooperate, but it all starts with intervention. Without it, plaintiff will be free to look after his own interests only, in violation of the agreements that control his relationship with the applicants.

If the Court requires further evidence of the prejudice to the BFB Creditors, and the unfitness of plaintiff Ewers to protect their interests, the Court need look no further than Ewers assertion that he has sued Pladott in Texas, and therein seeks rescission of all agreements made in connection with the Heron matters. See, <u>Plaintiff's Opposition To Motion To Intervene</u>, Tab 9. To quote Ewers, he seeks in the Texas case "*rescission of any obligation on Ewers' part to share any proceeds which may eventually be realized as a result of the debt that Ewers is owed by Heron*". <u>Plaintiff's Opposition To Motion To</u>

Intervene, page 9. In light of the exclusive control wielded by Ewers over the information concerning the Heron monies in New York and Canada, his willingness to mislead the Court when it suits his interests, and the inescapable fact that there never was any agreement whatsoever by Pladott to share expenses up front in the U.S., Ewers' nefarious intentions are thus clearly stated in his opposition, and should not be tolerated by this Court.

    4. <u>Idiocratic Circumstances</u>. The idiocratic circumstances in this case consist of Ewers' false claim that he was the sole petitioning creditor in the English bankruptcy court (discussed above), his false and misleading claim that he is individually a creditor of Heron while his only conceivable basis for such is the Compensation Agreement which lists not Ewers, but EPD Management LLC as the beneficiary (also discussed above), and his bizarre attempts to tar the intervenors with false accusations. For example, Ewers contends that intervenor Flamecrest Enterprises Limited Trust, which is asserted by the BFB Creditors to be a *trust*, has been liquidated, and offers in support of this false proposition nothing more than what appears to be a screenshot from an internet search (<u>Opposition To Intervention</u>, Tab19) indicating that a *corporation* by the name of Flamecrest Enterprises Limited has been dissolved. This is a good example of Ewers' shotgun style, leading to conclusions utterly unjustified by his assertions.

  To further illustrate plaintiff's willingness to disregard the plain meaning of documents he executes, he failed to advise the Court either in his <u>Complaint</u> or in his <u>Opposition To Intervention</u> that any assignment arising from the <u>Compensation Agreement</u> relates solely to the "Bankruptcy Claim". This is crucial because plaintiff alleges that the instant action is brought *not* to enforce a claim in the Bankruptcy

Proceeding, but outside of such proceeding. <u>Complaint</u>, ¶ 23. In fact, plaintiff asserts in the <u>Complaint</u> that he is specifically not seeking to enforce a Bankruptcy Claim but rather that this cause of action is not barred by the pending bankruptcy proceeding. Where does Ewers get standing to sue Heron on his own behalf? Not from the Compensation Agreement, which a) may or may not constitute an assignment; b) clearly applies only to a bankruptcy claim; and c) clearly is between Liner and EPD, which is not a party to the instant litigation. Ewers may or may not be legally able to act *on behalf of* Liner, (see Liner's memorandum) but neither Ewers nor EPD can claim an interest in any claim Liner may have against Heron outside of the bankruptcy proceeding. Ewers has not even asserted any other basis for his claims.

## .CONCLUSION

It is clear that the BFB Creditors meet all of the criteria for intervention as a matter of right, and that alternatively, the Court should permit their intervention. In accordance with Rule 24(a) it is indisputable that they legitimately claim an interest in the transactions which are the subject of the action, that they are so situated that the disposition of the action may impair their ability to protect their interest, and that Ewers can in no way adequately represent their interests. That is all that is required for granting intervention. Plaintiff has tried to obscure the issues by issuing baseless attacks, and attempting to mislead the Court, but all he has really done is reveal both his own disregard for the truth, and his real intention with regard to the Heron monies in New York and Canada.

For all of the foregoing reasons, the BFB Creditors respectfully request that the Court grant their <u>Motion to Intervene</u>.

Dated: October 20, 2004

PLAINTIFF-INTERVENORS
By their attorney,
LAW OFFICES OF
CHARLES P. KAZARIAN, P.C.

*[signature]*

Charles P. Kazarian
BBO#262660
77 North Washington Street
Boston, MA  02114
(617) 723-6676

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day the forgoing was served by delivering copies thereof to the United States Post Office in envelopes properly addressed and First Class postage prepaid, which envelopes were addressed as follows:

    Alan M. Spiro, Esq.
    Edwards and Angell, LLP
    101 Federal Street
    Boston, Massachusetts 02110

    Christopher Patrick Heron
    21 Dale House, Boundary Road
    London, NW8, United Kingdom

    Corporation Of The Bankhouse, Inc.
    Societe Bankhouse
    James F. Pomeroy
    11 Meadow Haven Drive
    Mashpee, Massachusetts 02649

*[signature]*

Charles P. Kazarian