

CAUSE NO. 2003-33307

| | | |
|---|---|---|
| E.P.D. MANAGEMENT COMPANY L.L.C. AND LARRY EWERS | § § § | IN THE DISTRICT COURT OF |
| vs. | § § § | HARRIS COUNTY, T E X A S |
| HOWARD EUGENE LINER | § | 151ST JUDICIAL DISTRICT |

### DEFENDANT'S FIRST AMENDED ORIGINAL COUNTERCLAIM AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **HOWARD EUGENE LINER**, Defendant/Counter-Plaintiff in the above-entitled and numbered cause, and file this his First Amended Original Counterclaim and Application for Temporary Restraining Order complaining of Plaintiffs/Counter-Defendants **E.P.D. MANAGEMENT COMPANY L.L.C.** and **LARRY EWERS** and respectfully state to the Court the following:

### PARTIES

1. Counter-Plaintiff was at relevant times a resident of Harris County, Texas but is now currently incarcerated in federal prison in Mississippi.

2. Counter-Defendant **E.P.D. MANAGEMENT COMPANY L.L.C.** ("E.P.D.") has answered and appeared herein.

3. Counter-Defendant **LARRY EWERS** (Ewers") has answered and appeared herein.

### FACTUAL BACKGROUND

4. On May 9, 2000, Liner entered into a profit sharing agreement with Hsin-Ming Chuo, also known as Alex Cho ("Cho"), whereby the two parties would equally share the profit from a future trading transaction. On July 18, 2000, Liner and Cho entered into an agreement with Christopher Patrick Heron ("Heron") to place $220,000,000.00 in blocked funds in a high yield

program with Heron that would generate a profit of $1,980,000,000.00 USD in a very short period of time. The initial $220,000,000.00 was to remain blocked and secured in a Taiwanese bank account.

5. Ewers is one of a group of intermediaries who initially arranged a commission fee agreement for EPD of $18,933,750.00 pursuant to the terms of a fee agreement dated November 9, 2000 in which the law firm of Buckley, Mathews, White & Howel LLP served as pay master. Ewers was part of a chain of brokers who were not principals in the transaction. However, Heron did not pay any of the profit from the trading transaction to anyone.

6. Cho contacted Alex Pladott ("Pladott") who was representing a different group of three creditors owed monies by Heron in order to coordinate legal activities against Heron. On July 4, 2001, Pladott recommended that Cho hire his United Kingdom solicitor, Anthony Feldman ("Feldman"). Thereupon, on August 23, 2001, Ewers hired Feldman on behalf of Cho in order to file a statutory demand in the amount of $1,980,000,000.00 against Heron.

7. On September 3, 2001, Heron was served in the United Kingdom with the statutory demand on behalf of Liner/Cho for the amount of $1,980,000,000.00.

8. At the end of December 2001, the representatives of the four creditors agreed to cooperate with one another as a result of Ewers' disclosure of "confidential" information. Ewers told Pladott that he had engaged the services of people working for various government agencies who were moonlighting. These people had located two of Heron's accounts with a total of $1.6 Billion. This was the only reason that Pladott and his group of Heron creditors decided to join forces with Ewers. A Memorandum of Understanding (Memorandum) was issued in December 2001 to memorialize the agreement between and among all the parties/creditors.

9. On January 15, 2002, the United Kingdom court held a hearing related to the four statutory demands against Heron. On January 17, 2002, representatives for the four creditors entered

into a settlement agreement with Heron wherein Heron acknowledged his debt to each of the four creditors. However, Heron breached the Settlement Agreement shortly after its execution.

10. On March 4, 2002, an application for a bankruptcy order against Heron on behalf of the four parties/creditors was filed in the High Court of Justice in London, United Kingdom with Heron being adjudged bankrupt on June 18, 2002.

11. Ewers told Pladott that he had initiated actions which had frozen the $1.6 Billion funds in the two Heron accounts prior to the bankruptcy order in the United Kingdom. Ewers also stated that he was able to seal the two cases in the "two jurisdictions" so that no one could gain access to them. He said that he had signed non-disclosure and confidentiality agreements with the people who had located the funds and that they wanted the court cases sealed.

12. In May 2002, Ewers approached Liner with a "business proposal" from Ewers' company, E.P.D. Ewers did not disclose to Liner that Heron's $1.6 Billion had been located nor did he disclose the Memorandum of December 2001. Based upon Ewers' representations and failures to disclose, on May 3, 2002 but effective July 1, 2001, Liner entered into a compensation agreement and non-disclosure agreement not with Ewers but with E.P.D. wherein Liner assigned fifty percent (50%) of his United Kingdom bankruptcy claim to E.P.D. in return for Ewers' financial support in the investigation and prosecution of the United Kingdom bankruptcy claim against Heron. Furthering his fraud and series of misrepresentations and failures to disclose, Ewers also persuaded Liner, under false pretenses, to grant him a power of attorney signed on May 22, 2002 by Liner, coupled with an interest, to act on Liner's behalf to attempt to collect the money that Heron owed Liner. However, the power of attorney was related to Liner's claim against Heron in the United Kingdom bankruptcy only and nothing else.

13. On March 19, 2003, Liner was arrested due to criminal charges for a matter which is

unrelated to the above case. Liner was sentenced to 135 months in prison on June 11, 2004.

14. While Liner was in prison, Ewers filed this lawsuit alleging various causes of action with the sole purpose of taking over Liner's rights to the $1,980,000,000 Heron owes Liner..

15. On or about January 4, 2004, Ewers filed Civil Action No. 04-10024-RWZ, *Larry Ewers v. Christopher Patrick Heron, et al.*, in federal district court in Boston, Massachusetts (the "Boston litigation"). In that proceeding, on July 9, 2004 Ewers requested a judgment in the amount of $5.94 Billion against Heron in Ewer's name only ignoring all of his agreements with his partners and principal and seeking to effectively exclude all other pertinent parties from any access to Heron's two bank accounts. On October 28, 2004, Ewers filed a motion in that proceeding wherein he argued that "as the sole member of EPD, Ewers has a beneficial interest in the Compensation Agreement." Ewers further argued in his motion that "The Compensation Agreement can only reasonably be construed to assign EPD an interest in all of the underlying causes of action Liner owned against Heron, and thus, to create a beneficial interest in Ewers, which in turn rendered the Power of Attorney as it expressly so states, a power of attorney coupled with an interest."

16. The records of the Texas Secretary of State establish the fact that EPD was not in good standing as of March 23, 2001 as its charter had been forfeited for failure to pay its franchise taxes. Therefore, EPD did not formally exist and as such it could not enter into any binding agreement and Ewers' compensation agreement with Liner therefore becomes null and void.

17. Moreover, the records of the Texas Secretary of State show that Ewers is not, and has never been, the sole member of EPD. Therefore, Ewers does not have a beneficial interest in the compensation agreement and the Liner power of attorney could not have been coupled with an interest. Additionally, **the alleged compensation agreement was between EPD and Liner only.** Ewers was never a party to this agreement. Consequently, Ewers cannot assert any claims arising

from the agreement. Ewers, neither as an individual nor as a stockholder, may personally own any assets of the corporation or beneficial interest in its causes of action.

18. Ewers has stated in judicial filings that a new Article of Organization dated Sunday, October 18, 1998 and executed by himself and his wife, Janice Ewers, made Ewers the President of E.P.D. However, this document has never been filed with the Texas Secretary of State and additional documents produced during the course of this lawsuit have established that the October 18, 1998 document is fraudulent. Ewers is not the President of E.P.D.

## LIMITATIONS OF EWERS' ALLEGED POWER-OF-ATTORNEY

19. Ewers' alleged power of attorney states that it was executed on June 18, 2002 with an effective date as of January 11, 2002. It was notarized on June 18, 2002, the same date that Heron was adjudged bankrupt by the United Kingdom Bankruptcy Court. This power of attorney was construed pursuant to the laws of the State of Texas and appointed Ewers to act on behalf of Liner only regarding the following contracts and matters:

> a. "That certain Memorandum of Understanding dated July 18, 2000 by and between Chris Heron, Hsin-Ming Chuo and Howard E. Liner."
>
> b. "That certain agreement dated January 17, 2002 by and between Howard Eugene Liner, Ah Ping Ban, Alexander Pladott, Anthony Stephen Feldman and Christopher Patrick Heron."
>
> c. "Cause No. 384-SD-2001; in the High Court of Justice in Bankruptcy; RE: Christopher Patrick Heron and Hsin-Ming Chuo and Howard Eugene Liner."
>
> d. "Cause No. 1625 of 2002; in the High Court of Justice in Bankruptcy; RE: Christopher Patrick Heron."

20. All four above "contract and matters" are under the exclusive jurisdiction of the

United Kingdom courts and Ewers did not take any legal action to domesticate any of the above in any court located in the United States.

21. Moreover, Ewers stated correctly in his complaint in the Boston litigation that "No reciprocity applies between the United States and United Kingdom courts." Therefore, there is a legal bar from using this power of attorney outside the jurisdiction of the United Kingdom courts. Furthermore, it is stated in the power of attorney "...the <u>sole and exclusive</u> power of attorney for conducting any and all business transactions of every nature and kind relating to the contracts, litigation, claims and causes of action <u>asserted</u> by me against Christopher Patrick Heron before the court in the above referenced matters..." The Boston litigation was not filed by Ewers until January 7, 2004 with the claims being asserted only by Ewers and not by Liner.

22. Ewers claimed in Paragraph 22 of his compliant in the Boston litigation that "pursuant to an exclusive power of attorney dated January 11, 2002, Ewers became and remains the sole and exclusive attorney-in-fact for Liner with respect, among other matters, to all rights of Liner under the Heron Settlement Agreement." This claim is materially false and misleading. Liner did not give Ewers any equity rights as part of the power of attorney, and under the terms of the Heron Settlement Agreement, Liner could not give any of his rights away as clearly stated in Paragraph 8.4 "...None of the parties to this agreement shall be entitled to assign this agreement or any of its rights and obligations under this agreement except as may be otherwise approved in writing by the other parties to this agreement."

23. It is clear from the power of attorney itself that Ewers did not act according to the limited authorization granted to him in this power of attorney and that he claimed certain rights that were never granted to him under the power of attorney.

6

## LITIGATION AND MOTIONS IN WHICH EWERS USED THE LINER POWER OF ATTORNEY

24. United Kingdom Case #0001625 of 2002 in the High Court of Justice, Bankruptcy, London, United Kingdom, RE: C.P. Heron. This litigation is the only one in which Liner has asserted claims and sought relief that was authorized under the terms of the power of attorney.

25. Unknown jurisdiction #1 in which Ewers located and froze a bank account in Heron's name with an amount of more than $700 Million USD using Liner's power of attorney without Liner's knowledge or authorization.

26. Unknown jurisdiction #2 in which Ewers located and froze Heron's bank account in Heron's name with an amount of more than $500 Million USD using Liner's power of attorney without Liner's knowledge or authorization.

27. Motion to Intervene dated November 6, 2003 in Civil Case #02-10532-RWZ in the Federal District Court in Boston, Massachusetts where Ewers argued the following before the court:

   a. "Effective January 11, 2002, Larry Ewers ("Ewers") became and remains the sole and exclusive attorney-in-fact for Liner, with respect to, among other matters, the Heron Settlement Agreement and all rights of Liner under that agreement."

   b. "Ewers seeks to satisfy his judgment against Heron."

   c. "Based on the application of Ewers as the petitioning creditor, Heron was placed in bankruptcy in the U.K. on June 18, 2002."

   d. Ewers requested the following order from the court: "a constructive trust in favor of Ewers should be imposed upon any assets received by defendants from Heron."

All of the above are misleading and materially false. Ewers did not inform Liner of the motion, and Liner did not assert or authorize it.

28. The Boston litigation filed on January 5, 2004 in which Ewers argued the following before the court:

   a. "Pursuant to an exclusive power of attorney dated January 11, 2002, Ewers became and remains the sole and exclusive attorney-in-fact for Liner with respect to, among other matters, all rights of Liner under the Heron Settlement Agreement."

   b. Ewers requested the following order from the court: "a constructive trust in favor or Ewers should be imposed upon any assets received by defendants from Heron."

All of the above are misleading, materially false and made with the sole purpose of creating the false perception that Ewers, not Liner, is the true Heron creditor. Ewers did not inform Liner of his intent to file this case, and Liner did not assert or authorize it.

29. Additionally in the Boston litigation in his motion filed on June 15, 2004, Docket Entry #11, Ewers argued the following:

   a. "Pursuant to an exclusive power of attorney dated January 11, 2002, Ewers became, and remains, the sole and exclusive attorney-in-fact for Liner with respect to, among other matters, all of Liner's rightS under the agreement. A true copy f the power of attorney is attached as Exhibit B. The $1,980,000,000 Cho/Liner debt is payable to Ewers."

   b. "...Heron's failure to pay the settlement sum by the payment date, without more, rendered the entire $1,980,000,000 due and payable to Ewers."

All of the above are misleading, materially false and made to create the false perception that Ewers himself is the true Heron creditor, not Liner.

30. Also in the Boston litigation, in his motion filed on July, 9, 2004 Docket #14, Ewers argued as follows:

    a. "Pursuant to the power of attorney, the $1,980,000,000 Cho/Liner debt is payable to Ewers."

    b. "Heron has admitted, both in the agreement and on his list of creditors in the U.K. proceeding, that his debt to Ewers is $1,980,000,000. Judgment should be entered in favor of Ewers and against Heron in the amount of $1,980,000,000, plus interest as provided by law."

All of the above are misleading, materially false and made to create the false perception that Ewers, rather than Liner, is the true Heron creditor

31. On July 16, 2004, Thomas L. Kummer, Liner's attorney, terminated all powers of attorney and mandates that Liner had previously granted Ewers

## CAUSES OF ACTION

### Breach of Contract

32. Counter-Plaintiff incorporates herein by reference the factual statements set forth in paragraphs 1 through 31 above.

33. As set forth herein, Ewers has acted outside the scope of the authority granted him by Liner before Liner terminated the underlying agreements. At all times prior to the breach and repudiation of the agreements between Counter-Plaintiff and Counter-Defendants, Counter-Plaintiff diligently and faithfully performed all of the duties and responsibilities that were required under the underlying agreements. Moreover, as set forth above, Ewers individually is not a party to several of

the underlying agreements with Liner. As such, he could not act pursuant to these underlying agreements. However, as also set forth above, he has wrongfully taken actions under the guise of authority that he did not possess to Liner's detriment. The foregoing acts and omissions by Counter-Defendants constitute a breach of the agreements.

34.  As a direct and proximate result of said breach of the agreements, Counter-Plaintiff has been severely damaged for which he now sues.

### Fraud

35.  Counter-Plaintiff incorporates herein by reference the factual statements set forth in paragraphs 1 through 34 above.

36.  Pleading more specifically in response to Counter-Defendants' Special Exceptions as it relates to the misrepresentations made by Counter-Defendants to Counter-Plaintiff prior to and after the parties entered into the underlying agreements in question with regard to Counter-Plaintiff's fraud cause of action, Counter-Plaintiff would state that the following misrepresentations which he relied on were made to him by Counter-Defendants through Ewers who represented that he had the authority and capacity to act on behalf of EPD:

> a)  The scope of the Agreement was related only to the "bankruptcy claim" filed on March 4, 2002 against Heron in Case No. 1625 filed in the High Court of Justice in Bankruptcy in London, United Kingdom;
>
> b)  Counter-Plaintiff would receive the funds from any collection of the bankruptcy claim;
>
> c)  EPD had provided financial support in the investigation and prosecution of the "bankruptcy claim" only;
>
> d)  EPD desired to continue with the bankruptcy claim until it was resolved;

e)  EPD stipulated and agreed that all sums received by Counter-Plaintiff as a result of the bankruptcy claim would be deposited into an appropriate trust account of mutually agreeable legal counsel;

f)  EPD would be reimbursed by Counter-Plaintiff for its expenses solely related to the bankruptcy claim asserted by Counter-Plaintiff. EPD would then provide a full accounting to Counter-Plaintiff for all fees incurred through the mutually agreed legal counsel who would be in charge of any reimbursement/disbursement to EPD;

g)  Ewers signed the Settlement Agreement with Heron on January 17, 2002 on behalf of Counter-Plaintiff;

h)  Ewers located funds belonging to Heron at the end of 2001; and

i)  Ewers had engaged former government employees in order to freeze Heron's two bank accounts.

Additionally, Counter-Defendants also failed to disclose that the Settlement Agreement with Heron prohibited Counter-Plaintiff from assigning any portion of his interest and rights to EPD and that the Settlement Agreement and any assignments made under it where under United Kingdom jurisdiction. Based on the above misrepresentations, Counter-Plaintiff entered into the agreements with EPD. EPD's misrepresentations provided Counter-Plaintiff with a sense of security and a level of comfort for the following reasons:

a)  The Agreement was related only to the outcome of the specific bankruptcy claim in the United Kingdom. It was under the jurisdiction of the United Kingdom Bankruptcy Court that had a strict procedure providing that any recovery from the Heron Bankruptcy would be paid only per Counter-

11

Plaintiff's instructions;

b) It provided security for Counter-Plaintiff since he knew that any funds recovered from Heron would be deposited into a trust account and would never be under EPD's sole control;

c) Counter-Plaintiff would not have any out-of-pocket expenses related to the recovery of any funds from Heron through the bankruptcy claim;

d) Counter-Plaintiff had a comfort level because EPD assured him that the agreement was for only the one litigation in the United Kingdom "asserted by Liner," and nothing else;

e) Ewers was the President of EPD; and

f) EPD was in good standing with the Texas Secretary of State in May 2002.

37. Prior to entering into the agreements discussed above, Counter-Defendants made the misrepresentations set out above to Counter-Plaintiff all the while knowing them to be false when they were made recklessly without knowledge of the truth and were made as positive assertions.

38. Counter-Defendants intended that Counter-Plaintiff rely to his detriment and injury upon the false statements and impressions of fact being made, and on the presumption that no material facts of the contrary existed. Counter-Plaintiff relied to his detriment upon the false statements and impressions of fact purposely created by Counter-Defendants and entered into the agreements believing that he could trust Counter-Defendants and believe what he had been told. As a result of Counter-Defendants' acts and omissions, Counter-Plaintiff has been damaged in an amount within the jurisdictional limits of this Court. Moreover, as Counter-Defendants' actions were done intentionally, Counter-Plaintiff also seeks punitive and exemplary damages from Counter-Defendants.

### Request for Declaratory Judgment

39.     Counter-Plaintiff incorporates herein by reference the factual statements set forth in paragraphs 1 through 38 above.

40.     Counter-Plaintiff asserts his claim under Texas Civil Practice and Remedies Code §37.001, *et seq.* to have his rights, status and other legal relationships under the underlying agreements he had with the Counter-Defendants established by a court of competent jurisdiction. More specifically, Counter-Plaintiff seeks a declaration from the Court that: 1) any powers of attorney that Counter-Plaintiff granted Counter-Defendants were limited to United Kingdom jurisdiction only; 2) any powers of attorney that Counter-Plaintiff granted Counter-Defendants did not give Counter-Defendants any equity right in any of the matters that were authorized in the powers of attorney; 3) any and all powers of attorney that were granted to Counter-Defendants by Counter-Plaintiff were terminated on July 16, 2004; and 4) the Compensation Agreement dated May 3, 2002 between EPD and Liner is null and void as it was procured by EPD through fraud and misrepresentation.1

41.     Counter-Plaintiff also seeks the recovery of his costs and reasonable and necessary attorneys' fees as are equitable and just pursuant to § 37.009 of the Texas Civil Practice and Remedies Code.

42.     Counter-Plaintiff now asks the Court, pursuant to the Texas Declaratory Judgments Act §37.001 *et. seq.*, for a declaration that: 1) any powers of attorney that Counter-Plaintiff granted Counter-Defendants were limited to United Kingdom jurisdiction only; 2) any powers of attorney that Counter-Plaintiff granted Counter-Defendants did not give Counter-Defendants any equity right in any of the matters that were authorized in the powers of attorney; and 3) any and all powers of

attorney that were granted to Counter-Defendants by Counter-Plaintiff were terminated on July 16, 2004.

### APPLICATION FOR TEMPORARY RESTRAINING ORDER

43. Counter-Defendants have and are to this date continuing in their course of tortious conduct as alleged and set forth herein. If Counter-Plaintiff's application is not granted, Counter-Defendants will continue, among other things, to take wrongful actions with the intent of depriving Counter-Plaintiff his rights and damages. Accordingly, Counter-Plaintiff requests that this Court: 1) order Counter-Defendants to refrain from acting on behalf of Counter-Plaintiff under any of the authorities allegedly granted Counter-Defendants by all of the powers of attorney; 2) order Counter-Defendants to submit this restraining order to all courts and third parties to which any of these powers of attorney were presented or used; and 3) that any of the parties refrain from taking any action that disrupts or has the potential to disrupt the status quo until final resolution of this lawsuit.

44. Counter-Plaintiff requests that the Court order Counter-Defendants to not take any actions that could disrupt the status quo as of the date of this application. Counter-Plaintiff has no adequate remedy at law should Counter-Defendants continue their tortious and fraudulent actions.

45. Counter-Plaintiff has served notice on Counter-Defendants of the hearing on this application. Moreover, Counter-Plaintiff has a likelihood of success on the merits and is willing to post a bond. However, Counter-Plaintiff requests that the bond be set in a reasonable amount due to Counter-Plaintiff's current financial situation and because of the damages the Counter-Defendants' conduct has caused Counter-Plaintiff.

---

1 Nevertheless, Liner's Bankruptcy claim against Heron was closed by the United Kingdom Bankruptcy Court on April 4, 2005. Therefore there has already been a resolution to the bankruptcy claim, as required in the Agreement.

## APPLICATION FOR TEMPORARY INJUNCTION

46. In order to preserve the status quo and the rights of the Counter-Plaintiff during the pendency of this action, Counter-Defendants should be cited to appear and show cause why they should not be temporarily enjoined during the pendency of this action from taking the tortious actions set forth and described herein with more particularity.

## ATTORNEY FEES

47. Counter-Plaintiff seeks reasonable attorney's fees and expenses for trial and/or appeal for this suit. All conditions precedent to recovery of said fees have been satisfied.

WHEREFORE, PREMISES CONSIDERED, **HOWARD EUGENE LINER,** Counter-Plaintiff requests:

(1) judgment against Counter-Defendants, jointly and severally, for actual damages;

(2) a declaratory judgment that: a) any powers of attorney that Counter-Plaintiff granted Counter-Defendants were limited to United Kingdom jurisdiction only; b) any powers of attorney that Counter-Plaintiff granted Counter-Defendants did not give Counter-Defendants any equity right in any of the matters that were authorized in the powers of attorney; c) any and all powers of attorney that were granted to Counter-Defendants by Counter-Plaintiff were terminated on July 16, 2004; and d) the Compensation Agreement dated May 3, 2002 between EPD and Liner is null and void as it was procured by EPD through fraud and misrepresentation.

(3) punitive damages in an amount to be assessed by the jury at the time of trial;

(4) pre-judgment and post-judgment interest at the maximum allowable rate as provided by law;

(5) costs of court;

(6)  the entry of a temporary restraining order restraining Counter-Defendants from those acts set forth above;

(7)  reasonable attorney's fees both for trial and/or appeal and expenses; and

(8)  any and other further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**LAW OFFICES OF KEVIN R. MICHAELS, P.C.**

By: _____
Kevin R. Michaels
State Bar No.: 00784598
11767 Katy Freeway, Suite 730
Houston, Texas 77079
Telephone: 281-496-9889
Facsimile: 281-496-4211

**ATTORNEY FOR DEFENDANT/COUNTER-PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served on Plaintiffs' counsel of record by regular mail on this 5th day of January 2006.

_____
Kevin R. Michaels