<u>MEMORANDUM OF FACTS RELATED TO</u>
<u>CIVIL ACTION NO. 04-10024-RWZ</u>

This case concerns a rather large debt owed by the defendant Christopher Patrick Heron ("Heron") to the following four creditors ("the Four") all of which are would-be intervenors in this case:

    A.  Howard Eugene Liner ("Liner")

    B.  Ah Ping Ban ("Ban")

    C.  Flamecrest Enterprises Limited Trust ("Flamecrest")

    D.  Balz Rudolph Wolfensberger Discretionary Trust ("Wolfensberger")

The above three would-be intervenors/creditors of Heron, namely Ban, Flamecrest and Wolfensberger, are all represented by Alexander Pladott ("Pladott") and hereinafter referred to as the "Pladott Group."

## INTRODUCTION

The legal contractual relationship among the Four was established at the end of December 2001 through a Memorandum of Understanding issued by Pladott on December 24, 2001 which memorialized <u>what had been agreed among the Four</u> and was acknowledged in writing by Larry Ewers ("Ewers") who represented Liner. Docket Entry No. 29 – Exhibits A and B.

On January 17, 2002, the Four entered into a Settlement Agreement with Heron ("the SA"). Docket Entry No. 29 – Exhibit C. Ewers executed the SA on behalf of his principal Liner by POA. The SA is under the exclusive jurisdiction of the U.K.

Shortly after the execution of the SA, Heron breached it causing the Four to file a bankruptcy petition against him in the U.K. The U.K. bankruptcy court adjudicated the SA and ruled that Heron owed the four the principal amount of $2.69 Billion USD with interest ("Heron Debt") to be paid by Heron on or before June 18, 2002. Heron did not pay it and was adjudicated bankrupt on June 18, 2002. Subsequently, the two representatives of the Four, namely Ewers and Pladott, entered into several written agreements related to the division among their respective groups of any monies eventually collected toward the Heron Debt.

In January 2004, Ewers filed a complaint against Heron based on the SA and the POA from his principal Liner. In his complaint, Ewers claimed that the Heron debt owed to his principal Liner should be paid to Ewers for his own personal benefit instead of to Liner. Furthermore, Ewers claimed that he himself was a Heron creditor rather than just the representative of a creditor. These claims were in contradiction to all written agreements in place between Ewers and his principal Liner as well as those made among other parties within "Ewers' group." They also contradicted every written agreement with the Pladott Group that Ewers made on his own behalf and on behalf of his principal Liner.

Ewers and the Four entered into a series of litigations in Houston, Texas and Boston related to their respective contractual rights and obligations and the division of any monies to be collected toward the Heron debt.

## THE THREE RELATED CASES

I. First related case in Texas, Cause No. 2003-33307 related **only** to the legal relationship between Ewers and his principal Liner and the distribution of Liner's eventual proceeds, pursuant to the SA, among Ewers' Group. Neither the SA, nor any of the three subsequent agreements among the Four related to the SA, was adjudicated in this Texas case.

II. Second related case in Texas was related **only** to Pladott's Group's share of the Heron Debt. Ewers sued Pladott seeking to void all agreements with Pladott related to the distribution between Ewers' Group and Pladott's Group of any money to be recovered toward the Heron Debt pursuant to the SA. Ewers used the second case in Texas as an excuse to exclude Pladott's Group from their rightful share of the Heron Debt during the October 28, 2004 hearing in this instant case. This Texas case was transferred to Boston U.S. District Court jurisdiction and became case 05-12014-RWZ.

III. Third related case in Boston, Case No. 05-10356-RWZ, in which Pladott sued Ewers for misleading the court in this instant case and for specific performance of his obligations to Pladott's Group per Ewers' binding agreements with them.

All the above related cases provided new evidence after the October 28, 2004 hearing which should cause this court to reconsider its prior ruling related to Pladott's group of would-be-intervenors and their participation in the distribution of funds collected toward the Heron debt. It is now up to this court to rule in via its judgment on the final distribution percentages and mechanism for delivery of the payments among Heron's creditors according to their contractual rights.

## THE PURPOSE OF THIS MEMORANDUM IS TO SHOW:

A. From the date of inception of the legal relationship among the Four in December 2001 until August 1, 2006, the Plaintiff and his principal Liner acknowledged and admitted that per all the agreements in palace, Liner is the "owner" of a percentage of the Heron debt and not a separate undivided amount of $1,980,000,000.

B. After the SA, the Plaintiff and his principal Liner entered into three legally binding agreements with Pladott's group of would-be intervenors which addressed their respective shares of any money to be collected toward the Heron debt. As of August 30, 2005, the jurisdiction for each of the three agreements was transferred from Houston, Texas to this Court's jurisdiction for any adjudication or interpretation.

C. The terms and conditions of the SA do not permit the Plaintiff and his principal Liner to give their own interpretation of their rights, or of the would-be-intervenors' rights, to this Court. Accordingly, Liner has the right to a percentage of the Heron debt, but not a separate undivided part. The SA is under the exclusive jurisdiction of the UK in every particular, including its formation and interpretation, and has already been adjudicated in the UK. It cannot be, and never was, adjudicated in the USA.

D. Per the new evidence and previous records, the interests of the would-be intervenors in the Heron debt should be included in any final judgment against Heron.

## STATEMENT OF FACTS RELATED TO ANY DISTRIBUTION OF MONEY
## TO BE COLLECTED TOWARD THE HERON DEBT

1.      Heron acknowledged in the SA with his four creditors that he owed them a principal amount of $2.69 Billion USD. He came to a compromise agreement with the Four which required him to pay them a settlement sum in lieu of what he owed them to be distributed among them on a "pari-passu" basis. (Paragraphs 3, 7 and 4.1 of the SA.)

2.      The SA clearly defined the legal parameters of the Four's legal relationship. It also provided that the Four held joint "title" to the "settlement sum." A default judgment against Heron cannot extinguish third parties' rights under the SA and its U.K. adjudication.

        A. Paragraph 1 of the SA is only for definition purposes. Under this paragraph, Heron acknowledged his debt to each of the Four. This was to establish the percentage of "ownership" of each of the Four in the "settlement sum" which would be paid by Heron to the Four or to be used if Heron was in breach of Paragraph 5, which he was not.

        B. Paragraph 2.2 of the SA is related to the interpretation of the SA and clearly states: "The clause and paragraph headings in this agreement are for ease of reference only and are not to be taken into account in the interpretation of the clause or paragraph to which they refer."

## THE TERMS & CONDITONS OF THE SA BEGIN WITH PARAGRAPH 4

C. Paragraph 5 of the SA is the only paragraph that states that upon its breach by Heron, the amount due (as per the definitions in Paragraph 1 to the Four would "become due and Payable," "but not otherwise." Heron is not in breech of this Paragraph.

D. Paragraph 8.1 of the SA specifically states that the SA superseded any prior agreements between each of the four and Heron regarding their previous claims against him. (This includes all prior agreements between Liner and Heron prior to January 17, 2002.)

E. Paragraph 8.4 of the SA prohibits the assignment of any of the parties' rights and obligations without the written consent of the other parties to the SA. If written permission were given, any such transferee would covenant with the other parties to perform all the obligations of the transferor under the SA.

F. Paragraph 8.7 of the SA specifically states that the parties agree that the SA is under the exclusive jurisdiction of the UK in every particular including formation and interpretation.

The Plaintiff's arguments to this court related to Liner's rights per the SA misinterpret the SA and inappropriately advance a new legal theory on contract interpretation. The record and subsequent agreements demonstrate that the Plaintiff interpreted the language of the SA differently than what it actually means legally. The

Plaintiff's arguments turn basic contract law on its head. The Plaintiff seeks to change the above terms of the SA under the guise of a default judgment against Heron. Under the terms and conditions of the SA, <u>Heron does not have any obligation to pay Liner a separate undivided amount of $1,980,000,000.</u>

3.    Shortly after executing the SA, Heron breached its Paragraph 4.1 (**not** Paragraph 5 as the Plaintiff has falsely alleged in the proceedings of this case) by failing to pay the settlement sum to the Four on (or after) the due date.

4.    The Four filed a bankruptcy petition against Heron in the UK. The UK bankruptcy court adjudicated the SA on April 23, 2002 and ruled that Heron had to pay the Four the total amount of the Heron debt on June 18, 2002. Heron did not pay the Four on the court-ordered due date, and therefore the UK Bankruptcy Court adjudicated Heron bankrupt on June 18, 2002. The Four agreed among them on June 20, 2002 to distribute any funds eventually collected toward the Heron debt on a "pari-passu" basis according to the breakdown which their solicitor had prepared dated June 20, 2002. Docket Entry No. 29, Exhibit E. All the above shows that Liner is the "owner' of a certain percentage of any funds eventually collected toward the Heron debt, **not** of a separate undivided amount as the Plaintiff falsely alleges.

5.    The SA formed the only basis for the adjudication in the U.K. of Heron's obligations to the Four. More significant is *that if it were not for the SA, there would be no basis for any claims against Heron.* (This court did not adjudicate the SA.)

6.    Ewers executed the SA on behalf of his principal Liner by POA. Ewers himself was not a party to the SA, did not have any rights under it and therefore could not

have any claims under its terms. Pladott represents the other three parties/creditors, all of whom are Heron creditors and parties to the SA.

      7.      Subsequent to the SA and its adjudication in the U.K., Ewers and Pladott entered into several additional agreements on behalf of their respective principals, all of which followed the terms and conditions of the SA as adjudicated in the UK. Docket Entry No. 29, Exhibits E, G and I.

      8.      The last of their agreements on behalf of their respective principals was dated May 5, 2003 (Docket Entry No. 29, Exhibit I)) in which they stipulated that any monies to be collected toward the Heron debt would be paid in the following proportions:

> "71.49%       to Ewers' Group
> 28.51%       to Pladott's Group
>
> per agreements each group has in place between themselves. The two (2) signatories to this agreement are not responsible for dispersing of funds to any individual other than those in their respective groups."

On January 5, 2004, Ewers filed his complaint against Heron, Case 1:04-CV-10024-RWZ, Docket Entry No. 1. His entire complaint against Heron is based on "Ewers' rights" for $1,980,000,000 under the terms of the SA, its adjudication in the UK and the POA his principal Liner granted him related to the SA. Ewers filed his first Motion for Final judgment on July 9. 2004 against Heron for his (Ewers') own benefit in which he attached two exhibits: the SA and Liner's POA. (Docket Entries No 13 and No 14.)

9.    ***Ewers acknowledged in Paragraph 12 of his complaint that the***

***settlement sum in the SA should be paid to the Four per the terms of the SA.***

10.    On July 20, 2004, Pladott sent a letter to this court, Docket No 17,

followed by Pladott's Group's Motion to Intervene filed on August 4, 2004. On October

28, 2004, this court held a hearing on the Motion to Intervene. Please see the transcript

of the hearing, Docket Entry No. 51.

11.    Excerpts from the hearing transcript:

| | |
|---|---|
| Page 4 | The Court – The case is essentially over. There are default judgments against all the defendants. |
| Page 9 | Mr. Spiro – Ewers is not suing in any representative capacity.<br>The Court – Ewers is just suing as Ewers?<br>Mr. Spiro – Yes, Your Honor. |
| Page 10 | The Court – The intervention complaint is under the Heron Settlement Agreement. |
| Page 12 | Mr. Spiro – There are these multiple contracts that were entered into between Mr. Ewers and Mr. Pladott. |
| Page 14 | The Court – Mr. Pladott's rights or non-rights are also being litigated in Texas?<br>Mr. Spiro – Yes, Your Honor, they are.<br>The Court – And that is a question as to the extent of the agreement?<br>Mr. Spiro – Yes, Your Honor. |
| Page 14/15 | The Court – And then where will the money go after its collection?<br>Mr. Spiro – It will be divided up according to the parties' contracts and their contractual rights.<br>The Court – Pladott depends on the Texas litigation?<br>Mr. Spiro – Yes, Your Honor. |
| Page 15 | The Court – And if there were to be an order in this court, as part of this judgment, that no disbursements are to be made without prior approval of this court, and notice to all parties, then are not all parties protected? |

|         | Mr. Spiro – I would believe so, Your Honor. |
| Page 16 | Mr. Spiro – And if we get recovery against those funds, then those funds are ultimately going to be disbursed in accordance with the parties' contract as adjudicated in Texas. |
| Page 20 | Mr. Kazarian - I am representing Pladott |
|         | The Court – The motion to intervene is on behalf of both Pladott and Liner? |
|         | Mr. Kazarian – Yes, Your Honor. |
|         | The Court – Okay. |
| Page 21 | The Court – I have one motion to intervene, which is by Liner, Ah Ping Ban, Flamecrest Enterprises Limited Trust and Balz Rudolph Wolfensberger Trust. |
|         | Mr. Kazarian – Yes, Your Honor.  Those three parties that are not Liner are the parties Pladott represents in the trustee attachment to the court. |
|         | The Court – I see.  Okay. |

12.    On November 2, 2004, the Court entered an order denying Pladott's

Group's Motion to Intervene stating that "*counsel shall submit a form of default judgment

against all existing defendants that shall include a clause prohibiting the plaintiff from

disbursing any funds collected without notice to the proposed intervenors and approval

by the court.*"

13.    Per the transcript, Docket Entry No. 51, there were essentially four (4)

reasons for the court's denial of the Pladott Group's motion to intervene in this case:

    A.    As stated by the Court – "The case is essentially over.  There are
           default judgments against all the defendants."

    B.    As stated by Ewers – "Ewers is not suing in any representative
           capacity."

    C.    As stated by Ewers – "Pladott depends on the outcome of Ewers'
           litigation against him in Texas."

        D.     As the court stated: "If there were to be an order in this court, as

                part of this judgment, that no disbursements are to be made

                without prior approval of this court, and notice to all parties, then

                are not all parties protected?"

14.     On November 3, 2004, as ordered by the court, the previous counsel for

the Pladott Group submitted a proposed judgment to this court, docket entries numbers 35

and 36.

15.     The Four filed an appeal related to their rights to intervene. The appeal

was denied by the appellate court noting: "The District Court fashioned an admirable

order protecting the claimants should there be mischief, thus efficiently accomplishing

much of what the claimants sought."

16.     Ewers filed the claim against Pladott in Texas ("Ewers' Second Texas

Case") as a result of Pladott's letter to this court dated July 19, 2004, Docket No. 17 and

Pladott's group's subsequent Motion to Intervene .

### NEW EVENTS AND NEWLY DISCOVERED EVIDENCE SINCE THE OCTOBER 28, 2004 HEARING

17.     In Ewers' second Texas Case, the Texas judge ruled on August 30, 2005

to transfer the case to this court in Boston in response to Pladott's Motion to Transfer.

The judge stated the following in her ruling in what is now Case No. 05-12014-RWZ:

    "While both courts are certainly competent to apply Texas law to the dispute, if

    necessary, it appears that the Massachusetts court is already familiar with the

    issues presented."

And

> "That circumstance alone suggests that the cases should be adjudicated in one
> forum, if for no other reason than to eliminate the potential for strategic
> advantage to one party and likelihood of inconsistent ruling.  For those, and all of
> the other reasons discussed, the court finds that a transfer to the District of
> Massachusetts is appropriate, so that these claims can be consolidated with the
> ones pending in that jurisdiction."

18.    On October 3, 2005, Ewers' second Texas Case, which was transferred to
Boston, became Case No. 05-12014-RWZ. Ewers never filed a single motion in this case
after it arrived in Boston.  It was finally terminated on May 9, 2006, Docket Entry No. 6.
Ewers' Texas Case against Pladott is therefore terminated, and as Ewers represented to
this court, any money collected under the terms of the final judgment in this instant case
should be divided up according to the parties' contracts and their contractual rights.

19.    On February 23, 2005, Pladott filed a complaint against Ewers in Boston,
Case No. 05-10356-RWZ, Docket Entry No. 1, for specific performance of the SA and all
subsequent agreements between them.

20.    Pladott stated the following facts in paragraph 33 of his Complaint: "The
acting solicitor in the U.K. for the four parties/creditors, Anthony Feldman ("Feldman")
issued a document dated June 20, 2002 indicating the amount of the outstanding Heron
debt, including interest, owed to each of the four parties/creditors.  The four
parties/creditors all agreed that the distribution of any funds eventually collected toward
the Heron debt be distributed on a 'pari passu' basis:

| A. | Cho/Liner | 71.49% |
|----|-----------|--------|
| B. | Ban/Flamecrest/Wolfensberger | 28.51%" |

Please note: Ewers represented Liner by POA. Ewers himself was not a party/creditor.

21.     On April 29, 2005 in Docket No. 5, Ewers answered the numbered allegations from Pladott's complaint ("Ewers' Answer"). Ewers' answer to Paragraph 33 (that the distribution of any funds eventually collected toward the Heron debt be distributed on a 'pari passu' basis—Liner/Cho 71.49% and Pladott's Group—28.51%) was: "On information and belief, admitted." Accordingly, Liner has the right of a percentage of the Heron debt, but not a separate undivided amount.

22.     Pladott stated in Paragraph 35 of his complaint: "On January 29, 2003, Ewers entered into an agreement with Pladott regarding Heron's assets." Ewers' answer to Paragraph 35 was: "The agreement dated January 29, 2003 in its entirety speaks for itself."

23.     Pladott stated in Paragraph 37 of his complaint: "On May 5, 2003, Ewers and Pladott entered into an additional agreement regarding the recovery of Heron assets…" Ewers' answer to Paragraph 37 was: "The agreement dated May 5, 2003 in its entirety speaks for itself."

24.     Case No. 05-10356-RWZ in Boston was terminated on May 9, 2006.

25.     In the first Texas case, Liner filed a motion on August 1, 2006 in which he submitted a "Statement of Relevant Facts" wherein he acknowledged that *"the four creditors agreed amongst themselves to share in any money recovered towards the Heron debt on a 'pari-passou' basis."* He also acknowledged that *"the Settlement Agreement established that Liner's share of the Heron debt was 71.49% with the*

*remaining 28.51% being allocated to Pladott's group of creditors*." Accordingly, Liner
has the right to a percentage of the Heron debt, not to a separate undivided amount.

26.     In the first Texas case, the court issued an "agreed final judgment with
prejudice" on September 15, 2006 for Cause No. 2003-33307 based upon what the
"parties-in interest" agreed among them without adjudicating any of the disputed issues.
("agreed judgment") One of the disputed issues was between Ewers and his principal
Liner in that Ewers claimed 100% of Liner's share in the Heron Debt. The agreed
judgment in Texas contradicts Ewers' statements of material facts to this court from the
first day he filed his initial complaint followed by his Motion for Default Judgment
against Heron and later through the intervention procedures and his litigation against
Pladott. The outcome of the Motion to Intervene would have been different if the court
had possessed all the true facts related to Ewers' involvement in the Heron debt.

27.     The following are the applications of the agreed judgment in Houston for
Ewers' Group's 71.49% share of the Heron debt in this instant case:

A.      Ewers is suing Heron in a representative capacity on behalf of his
        principal Liner by POA under the terms of the SA, its adjudication in the
        U.K. and all subsequent agreements. He is also representing other parties
        who have no rights under the SA. They have made agreements amongst
        themselves regarding the distribution of Liner's proceeds under the terms
        of the SA.

B.      Ewers' portion in his group's share of the Heron debt is 30%, all of which
        is against Liner's rights for proceeds under the terms of the SA.

C.      Ewers' portion of the Heron debt is:  30% X 71.49% = 21.447%

D.    Liner's portion in his group's share of the Heron debt is:  16%

E.    Liner's portion of the Heron debt is:  16% X 71.49% = 11.438%

F.    The 54% balance of Ewers' group's share of the Heron debt is divided among three other parties, all of which had claims against Liner's rights for proceeds under the terms of the SA:

| | | |
|---|---|---|
| 1. | ICF | = 38% X 71.49% = 27.166% |
| 2. | Buckley | = 15% X 71.49% = 10.724% |
| 3. | Larry Morris | = 01% X 71.49% = 00.715% |

All of the above is contrary to Ewers' numerous and diverse representations to this court. Liner is the only person from Ewers' group who has specific rights for certain proceeds under the terms and conditions of the SA. All the other parties in the first Texas case had claims against any eventual proceeds which Liner collected pursuant to his rights under the SA.

28.    Pladott's Group of would-be intervenors' share of any money to be collected toward the Heron debt is 28.51% as per the SA, its UK adjudication and all subsequent agreements.

## PER THE COURT'S PREVIOUS RULINGS AND DECISIONS

A.    No "parties-in-interest" should appear on any final judgment for disbursements.

B.    Any monies eventually collected pursuant to any final judgment found anywhere in the world shall be deposited exclusively with this court.

C.    All actions pursuant to any final judgment will be on the docket, transparent and open to the public.

D.    Any monies eventually collected pursuant to any final judgment shall be

disbursed only after all parties, including the would-be intervenors, file their claims and

with the specific approval and orders of this court.

E.    This court should retain jurisdiction of all efforts to collect, and of all assets

which may be collected, pursuant to the final judgment.

November 13, 2006

Seng Fai Chan, Solicitor
Level 13 Septimus Roe Square
256 Adelaide Terrace
PERTH WA 6000 AUSTRAILIA
Tel:  (08) 9325-2611
Fax:  (08) 9325-2811
sfchan@global.net.au